**The STATE of Wyoming, Petitioner,**

v.

**William WELCH, Respondent.**

**The STATE of Wyoming, Petitioner,**

v.

**Joseph MICHENER, Jr., Respondent.**

Nos. 92–191, 92–192.

Supreme Court of Wyoming.

April 27, 1994.

Rehearing Denied May 25, 1994.

Joseph B. Meyer, Atty. Gen., Sylvia Lee Hackl, Deputy Atty. Gen., Barbara L. Boyer, Senior Asst. Atty. Gen., Cal Rerucha, Albany County Atty., Kenneth T. Brown, Albany County Chief Deputy, and Robert A. Willis, Albany County Deputy, for petitioner.

Ronald G. Pretty, Cheyenne, for respondent Welch.

Glenn A. Duncan, Laramie, for respondent Michener.

Before MACY, C.J., and THOMAS, CARDINE, GOLDEN and TAYLOR, JJ.

MACY, Chief Justice.

This Court granted a petition for a writ of certiorari and stayed the proceedings in the district court to review that court's pretrial ruling that evidence of contraband which was seized during a routine traffic stop must be suppressed because the contraband was seized unreasonably under the standards enunciated in the Wyoming Constitution and the United States Constitution.

We reverse and remand.

The State of Wyoming states this issue:

Whether the district court erred in suppressing evidence which was the result of a "canine sniff" of Respondents' vehicle and subsequent search based on probable cause, because the initial stop of Respondents' vehicle was proper and was followed by a minimally intrusive detention of Respondents' vehicle for a reasonable period of time.

At about seven o'clock in the morning of May 25, 1992, Dan Dyer, a patrolman with the Wyoming Highway Patrol, was traveling westbound on Interstate 80 near Laramie, Wyoming, when he noticed two cars traveling in the eastbound lane. The two cars, a cream-colored car without license plates and a pickup which was closely following it, appeared to be traveling together. Patrolman Dyer turned his vehicle around in the median and began following the two vehicles in the eastbound lane. The pickup had a topper on it, and it also had nylon webbing where the tailgate would have been. The back end of the pickup was completely open: the topper did not have a door, and the pickup did not have a tailgate. Patrolman Dyer testified that he had never seen both a topper with no door and nylon webbing for a tailgate used as a combination on the same vehicle and that it struck him as being unusual. He reasoned that, generally, when a tailgate has been removed, it has been done to facilitate better gas mileage but that this vehicle had a topper, which would negate that normal purpose for removing the tailgate.

The cream-colored car had a temporary sticker in the back window, so Patrolman Dyer desisted from his concern that it did not have any license plates. The pickup passed a semi-truck and failed to properly signal the lane change as is required by WYO.STAT. § 31–5–217 (1989).[1] The patrolman stopped the pickup because of the violation at 7:13 a.m. at a point about six miles east of Laramie. He radioed the stop to his dispatch office along with the license plate number of the pickup. As he walked up to the vehicle, he noticed: "[T]here appeared to be someone sleeping in the back there, at least I saw some feet, I assumed they were sleeping rather than dead." He also observed:

[T]here was a liner, a plastic liner in there, and it was quite clean. There was no old junky tin cans, pop cans, beer cans, or pieces of wood you might use to block up a vehicle if you have to change a flat tire, in fact there was no spare tire in there either. All I saw in there was one, or two, or possibly three small duffle bags, and one person in there. I thought that was quite strange.

When Patrolman Dyer got to the front of the vehicle, he saw a fist-size clove of garlic, a radar detector, and a sticker on the window from Miramar Naval Station. The sticker seemed odd to him because the driver did not look like the "military type." He also noticed, through the window of the topper, that the ceiling inside the topper sagged down an inch or two in the center.

Patrolman Dyer informed the driver that he had made an illegal lane change. He asked who owned the pickup, and the driver replied that it belonged to his friend, "Soso." The registration listed the owner as being "Suaso." Since the patrolman spoke Spanish and recognized the name as being "an Hispanic name," he believed that the driver had mispronounced the name. Patrolman Dyer later found a ticket folded inside the registration which had been issued to the driver by the California Highway Patrol on April 6, 1992, indicating that the driver had driven

---

1. Section 31–5–217(b) provides:
   (b) A signal of intention to turn right or left when required shall be given continuously dur-

ing not less than the last one hundred (100) feet traveled by the vehicle before turning.

the vehicle for quite sometime but still did not know how to correctly pronounce the registered owner's name. In response to Patrolman Dyer's question as to where he was going, the driver indicated that he had traveled from San Diego to San Francisco and was headed to the Boston area to see his sick father who was going to have surgery.

The patrolman asked the driver for his driver's license and the vehicle registration. He told the driver that he was going to write a warning ticket for the illegal lane change and that the respondents could then be on their way. The vehicle registration reflected that the registered owner was from San Diego. The patrolman testified that the fact that the owner was from San Diego made him suspicious because San Diego "or practically anywhere in Southern California is a major drug source for narcotics coming into our country." When he reached his patrol car, he decided that he would detain the respondents. Approximately six minutes after he had made the initial stop, Patrolman Dyer requested that the dispatcher send the canine drug detection team.

While he was waiting for the dog to arrive, the patrolman filled out the warning citation. A second officer arrived on the scene, after which Patrolman Dyer approached the pickup and asked the driver to drive the pickup ahead to the pull-out area. Patrolman Dyer again approached the pickup in the pull-out area and asked the driver how well he knew the owner of the pickup and why he had gone through San Francisco if he was in a hurry to get to Boston. The driver indicated that the passenger who was in the back knew Suaso. The patrolman asked the passenger about Suaso and asked him for identification.

Patrolman Dyer went back to the cab area and asked the driver if he had any weapons in the cab and whether he minded if the patrolman took a look. The driver stated that he did not mind if the patrolman looked for weapons in the cab. Patrolman Dyer testified that the driver was nervous and became more and more nervous during the stop. The patrolman also thought that the passenger exhibited unusual behavior because he remained asleep so long in the pickup bed: "Usually when you make a traf-fic stop the people wake up that are sleeping no matter where they were, whether in the pickup bed, they look up and around. This was unusual to have someone still motionless in the back."

The narcotics dog was located twenty-five miles west of Laramie at the home of Robert DeBree, an investigator for the Albany County Sheriff's Office. Investigator De-Bree, who was in Laramie at the time, received the request for the narcotics dog at about 7:21 a.m. He telephoned his wife at home and instructed her to immediately fetch the dog and meet him between their home and Laramie so as to expedite the dog's arrival. Investigator DeBree and the dog arrived at the traffic stop scene at approximately 7:55 a.m. The patrolman approached the driver and the passenger, who were both standing, and said: " 'I think you have dope in here, that's why the dog. You can tell us where it is, might look a little more cooperative. Do you mind if we go ahead and have the dog walk around the vehicle or in it.' " The driver responded: " 'Go ahead.' "

The investigator led the dog around the pickup a couple of times, and the dog alerted to the left front of the topper. After confirming that the dog had alerted, Patrolman Dyer got into the bed of the pickup, pulled back the liner, and found a rectangular-shaped block wrapped in clear plastic and containing marijuana. The respondents were arrested for narcotics trafficking. Eventually, the pickup was fully searched and approximately 347 pounds of marijuana, $21,600 (including $1,700 taken from the passenger) in one-hundred-dollar bills, and a tool used to take out the rivets in the topper were found.

On May 26, 1992, the respondents, William Welch and Joseph Michener, Jr., were charged with intent to deliver a controlled substance in violation of WYO.STAT. § 35–7–1031(a)(ii) (1988). The marijuana which had been found in their pickup when they were routinely stopped for the traffic violation was the principal evidence against them. The respondents filed motions to suppress that evidence, and, after holding a hearing, the district court issued an order on October 15,

1992, suppressing the "evidence derived from the seizure of the Defendants and the search of the vehicle they were driving" because the marijuana and cash were confiscated in violation of the Fourth Amendment to the United States Constitution[2] and Article 1, Section 4 of the Wyoming Constitution.[3] The district court found:

1) Highway Patrolman Dyer effected a lawful stop on Defendants' vehicle for an improper lane change, being a misdemeanor violation occurring in the patrolman's presence. This court concludes that the initial stop of Defendants' vehicle was lawful and not pretextual even though the patrolman may have had underlying motives relative to drug suspicion at the time of the stop.

2) After the patrolman effectuated his initial stop and determined that a warning ticket should be issued the patrolman should have returned Defendant Michener's drivers license and registration to attempt to obtain a voluntary consent from Defendants for a search of the vehicle.

3) By a preponderance of the evidence the court finds that the patrolman testified that the Defendants were not free to go by reason of the patrolman's suspicion of drug involvement. Due to the combination of circumstances the Defendants had objective reason to believe that they were not free to end the conversation and proceed on their way. Therefore a seizure of Defendants' persons was effected.

4) At the time the seizure of the Defendants' persons was effectuated there was insufficient articulable suspicions or probable cause to make an arrest, although the patrolman subsequently developed probable cause by his further inquiries over a fifty minute delay and subsequent detection dog involvement.

The district court also instituted a bright line rule for cases such as this one:

[A] search and seizure will not be sustained unless following the completion of the initial investigatory stop for a traffic violation, the drivers license and registration are returned and if further consent to search short of arrest is attempted, that a written consent form must be produced for the defendant's signature. Short of probable cause for arrest or consent, the defendants must be free to go, otherwise a coercive and non-consensual encounter between a private citizen and a law enforcement officer is created.

We agree with the district court that Patrolman Dyer's stop of the respondents was not pretextual but was lawful in all respects. We also agree that the patrolman's actions at the scene of the traffic stop amounted to a detention and that the respondents were not free to leave. However, we disagree with the district court's finding that Patrolman Dyer did not have sufficient articulable suspicions to justify detention of the respondents.

■ The respondents assert that many, if not all, of Patrolman Dyer's observations were as consistent with innocence as they were with guilt. We embrace the doctrine that even conduct which is wholly lawful and seemingly innocent may form the basis for a reasonable suspicion that criminal activity is afoot. *United States v. Sokolow*, 490 U.S. 1, 6–8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *United States v. Glover*, 957 F.2d 1004, 1013 (2d Cir.1992). Patrolman Dyer did not necessarily attribute this stop and his suspicion that the respondents were drug couriers to his drug profile training, though he had received such training. Rather, he credited his knowledge of, and experience with, similar arrests where, in fact, circumstances such as those he observed that day

**2.** The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

**3.** Article 1, Section 4 of the Wyoming Constitution recognizes:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause, supported by affidavit, particularly describing the place to be searched or the person or thing to be seized.

were correctly put together to form reasonable articulable suspicions.[4]

The respondents rely upon several Tenth Circuit Court of Appeals cases, but those cases are not in point. In each case, the Tenth Circuit Court found that reasonable articulable suspicions were lacking, which was not the situation here. *See United States v. Walker*, 933 F.2d 812 (10th Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992) (suspect acted nervous); *United States v. Guzman*, 864 F.2d 1512 (10th Cir.1988) (stop made on the basis of a hunch in the middle of New Mexico's August desert heat; suspect nervous); and *United States v. Recalde*, 761 F.2d 1448 (10th Cir.1985) (stop made on the basis of a hunch alone). The Tenth Circuit decision which is most relevant to our inquiry today is *United States v. Soto*, 988 F.2d 1548 (10th Cir.1993). In that case, the Tenth Circuit Court distinguished *Walker, Guzman,* and *Recalde* and found that a police officer's observations that the suspect was "panicky" and unable to give an address for his uncle from whom he had borrowed the car which he was driving formed the basis of a reasonable articulable suspicion. In the case here, Patrolman Dyer had a list of circumstances which far exceeded the circumstances enumerated in *Soto* and the other cases cited in *Soto* (e.g., *United States v. Corral*, 899 F.2d 991 (10th Cir.1990) (spare tire out of place and bulge in spare tire well)). *Soto*, 988 F.2d at 1555.

■ The critical question which we must answer in more detail is whether Patrolman Dyer violated the respondents' constitutional rights by detaining them along the highway for approximately fifty minutes while he concluded his investigation.

The case of *United States v. Hardy*, 855 F.2d 753 (11th Cir.1988), *cert. denied*, 489 U.S. 1019, 109 S.Ct. 1137, 103 L.Ed.2d 198 (1989), is directly in point. In assessing the reasonableness of a fifty-minute detention in that case of a suspected drug courier by the Georgia State Patrol, the court said:

The Georgia State Patrol could not have anticipated appellants' journey, and appellants make no suggestion that every state trooper must be accompanied by a narcotics dog. The state patrol did have a trained dog available within twenty-five miles, a distance we find sufficiently short given the rural nature of the area.

855 F.2d at 760.

In *Glover*, the court held that a thirty-minute detention at a bus terminal in Buffalo, New York, while officers awaited arrival of the narcotics dog, was not unreasonable. 957 F.2d at 1013; *and see Cresswell v. State*, 564 So.2d 480 (Fla.1990) (tacitly approving approximately forty-five-minute detention to await arrival of narcotics dog); and 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.2(f) (2d ed. 1987 & Supp.1993).

Given the circumstance that the stop in this case was made six miles east of Laramie and that a narcotics dog was transported to the scene with dispatch from twenty-five miles west of Laramie, we hold that the detention here was not unreasonable in any respect.

■ In summary, we hold that the district court erred in suppressing evidence obtained as a result of the "canine sniff" of the respondents' vehicle. The initial stop was lawful and was followed by a minimally intrusive detention of the vehicle and the respondents on a reasonably articulable suspicion premised upon objective facts indicating that the respondents' vehicle contained contraband. We specifically reject the bright line rule adopted by the trial court for its judicial district. The reasonableness of the detention is to be measured by whether the police acted diligently under all the circumstances of the case and whether the detention involved delay unnecessary to a legitimate police inquiry. *United States v. Sharpe*, 470 U.S. 675, 683–88, 105 S.Ct. 1568, 1574–76, 84 L.Ed.2d 605 (1985).

Reversed and remanded for further proceedings consistent with this opinion.

---

4. " 'Observation more than books, experience rather than persons, are the prime educators.' AMOS BRONSON ALCOTT, *Table Talk*, pt. ii." BRUCE BOHLE, THE HOME BOOK OF AMERICAN QUOTATIONS at 135 (1967).

CARDINE, J., files a dissenting opinion in which GOLDEN, J., joins.

TAYLOR, J., files a concurring opinion.

CARDINE, Justice, dissenting, with whom GOLDEN, J., joins.

This is a tale of two cases, both resulting in reversal of the trial judges' decisions. The cases are so inconsistent that no trial judge in the future can feel confident in his/her suppression hearing ruling—but the judge can be confident of this: No matter what the ruling, it will be reversed.

In one case, we held a ten-minute detention in order to run an on-site computer check was too long, the evidence was suppressed and the trial judge, who ruled the evidence admissible, was reversed. *Wilson v. State,* 874 P.2d 215 (Wyo.1994). In the other case, we held a fifty-minute detention to bring a drug detection dog thirty-one miles was not too long and the trial judge, who ruled the evidence inadmissible, was also reversed. *State v. Welch,* 873 P.2d 601 (Wyo. 1994). In both cases, we reversed both trial courts' decisions, although these trial courts held hearings, took evidence and testimony, observed the demeanor of witnesses, their manner of testifying, judged their credibility, resolved disputed questions of fact, and gave such weight to the evidence as the courts determined it should have in making their decisions. We based our decisions on the written words in a cold record without the benefit of seeing and hearing any live witnesses testify or assessing their credibility and weight of the testimony. Because I believe that the court's decision is incorrect and is not consistent with *Wilson v. State,* I dissent.

In *Wilson,* we held that the suspect was seized when a police officer asked him to wait at a street corner. Wilson waited at that corner for almost ten minutes. When the police officer received the results of an NCIC check of Wilson, which was started prior to the seizure, the officer went to the corner and arrested Wilson, who was the subject of two outstanding warrants. We found that Wilson was unconstitutionally seized because the officer did not "possess any articulable facts sufficient to create a reasonable suspi-

cion of past or present criminal conduct" on the part of Wilson which would justify the seizure. *Wilson,* 874 P.2d at 224.

In this case, the court holds that a fifty-minute detention in a remote area on a highway is all right because the officer possessed enough "articulable suspicions" to create a reasonable suspicion of present criminal conduct on the part of Welch and Michener. Majority op. at 604. The trial court, however, which held the suppression hearing, heard the evidence and observed the witnesses, determined that the suspicions observed by Officer Dyer came *after* he had summoned the canine unit. This finding is not clearly erroneous. Officer Dyer had no reasonable articulable facts upon which he could have formed a reasonable suspicion at the time he stopped and detained respondents. This officer relied on a "drug courier profile" and a hunch, that is all. It was insufficient.

The State of Wyoming, petitioner, frames the issue as follows:

> Whether the district court erred in suppressing evidence which was the result of a "canine sniff" of Respondents' vehicle and subsequent search based on probable cause, because the initial stop of Respondents' vehicle was proper and was followed by a minimally intrusive detention of Respondents' vehicle for a reasonable period of time.

## FACTS

At about 7:00 a.m. on May 25, 1992, Patrolman Dyer was in the westbound lane of Interstate 80 near Laramie, Wyoming, when he noticed a car and a pickup traveling in the eastbound lane. The two vehicles, a cream colored car and a pickup, drew his attention because they seemed to be traveling together and one of the vehicles did not have license plates. Patrolman Dyer crossed the median and began following the car and pickup. While following the pickup, Patrolman Dyer noticed that it had a camper or topper on it and it also had nylon webbing where the tailgate would have been. The back end of the pickup was completely open with no door on the camper and no tailgate. The patrolman testified that he had never seen both a

camper top with no door and nylon webbing for a tailgate as a combination on the same vehicle. He reasoned that generally when a tailgate is removed, it is done so to facilitate better gas mileage; but in this vehicle, there was a topper which would negate that normal purpose for removing the tailgate.

By now it was apparent that the cream colored car and the pickup were not traveling together and that the basis for the patrolman's initial suspicion was nonexistent. Nevertheless, the patrolman continued behind the pickup and when it passed a semi-tractor trailer, the patrolman noted that the driver signaled to pass only as he began to move toward the adjoining lane to pass. Then, after passing the semi-truck, the pickup moved back into the right lane but only signaled after he had already begun to move. The patrolman recognized this as an improper lane change in violation of W.S. 31–5–217 (1989) and therefore stopped the vehicle at mile marker 322, about six miles outside of Laramie. As the patrolman approached the pickup, he noticed that someone was sleeping in the back of the pickup bed.

The patrolman, at the front of the vehicle, saw a clove of garlic, a radar detector, and a sticker on the window from Miramar Naval Air Station. The patrolman claimed also seeing through the window of the camper that the ceiling sagged down an inch or two in the center. (No drugs were found in the ceiling.) The patrolman asked whose truck it was, and the driver replied that it belonged to a friend named Soso. The registration listed the owner as Suaso. The license plates were California plates, and the registration reflected that the registered owner was from San Diego, California. This is the sum total of all the patrolman knew when he decided to detain respondents and call the drug detection unit. Whatever he learned after the illegal detention is irrelevant to the inquiry.

The patrolman obtained the license and registration from the driver and told him he would write a warning ticket for the illegal lane change and then they would be on their way. However, when he reached his patrol car, he decided that he would detain respondents. The patrolman then requested the canine drug detection team.

The dog finally arrived, alerted, marijuana was found, and respondents Michener and Welch were each charged with possession with intent to deliver a controlled substance in violation of W.S. 35–7–1031(a)(ii). Counsel for respondents filed motions to suppress the evidence that was discovered during the search of the truck, claiming there was no reasonable suspicion for detaining respondents after the initial stop and that the failure to return the driver's license and registration invalidated the consent. After conducting an evidentiary hearing, the district court ordered that the evidence be suppressed.

We granted the State's petition for writ of certiorari.

### STANDARD OF REVIEW

When reviewing a district court's ruling on a motion to suppress,

> [f]indings on factual issues made by the district court considering a motion to suppress are not disturbed on appeal unless they are clearly erroneous. *Hyde v. State,* 769 P.2d 376, 378 (Wyo.1989); *Roose v. State,* 759 P.2d 478, 487 (Wyo.1988). * * * Since the district court conducts the hearing on the motion to suppress and has the opportunity to: assess the credibility of the witnesses; the weight given the evidence; and make the necessary inferences, deductions and conclusions, evidence is viewed in the light most favorable to the district court's determination. *United States v. Werking,* 915 F.2d 1404, 1406 (10th Cir.1990).

*Wilson v. State,* 874 P.2d at 218. *See also Murray v. State,* 855 P.2d 350, 354 (Wyo. 1993); *United States v. Soto,* 988 F.2d 1548, 1551 (10th Cir.1993) (*citing United States v. Horn,* 970 F.2d 728, 730 (10th Cir.1992) and *United States v. Evans,* 937 F.2d 1534, 1536 (10th Cir.1991)).

The district court held that after the warning for the illegal lane change was issued, the driver's license and registration Patrolman Dyer took from respondents should have been returned. The court then held that the subsequent detention of the vehicle was in violation of the United States Constitution

and therefore suppressed the evidence that resulted from the search pursuant to the detention.

The State contends that the district court's decision to suppress the evidence was erroneous. I will examine the State's claim in light of the Fourth Amendment to the United States Constitution and the law interpreting it. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The search and seizure provision of the Wyoming Constitution is substantially similar and provides:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause, supported by affidavit, particularly describing the place to be searched or the person or thing to be seized.

Art. 1 § 4, Wyo. Const. Although the Wyoming constitutional provision concerning search and seizure was cited, it was not briefed as an independent reason for decision. *See Wilson v. State*, 874 P.2d at 218–19. The Fourth Amendment requires probable cause to seize persons or things. The United States Supreme Court has adopted a lesser standard, reasonable suspicion, if the person is seized for a limited time to conduct a search for weapons. *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968). Further interpretations of *Terry* have authorized law enforcement officers to briefly detain persons for investigative purposes if the officer has a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (*quoting in part Terry*, 392 U.S. at 30, 88 S.Ct. at 1884–85). *See also*

*Keehn v. Town of Torrington*, 834 P.2d 112, 116 (Wyo.1992).

My analysis of this stop begins at the point this court takes issue with the district court decision. Although the stop for an illegal lane change looks suspiciously pretextual, especially after the initial reason for suspicion disappeared (two vehicles traveling together), the trial court accepted the initial stop and subsequent detention for the period of time it took to write the warning ticket as valid. The dispute is over whether the patrolman had reasonable suspicion to detain respondents further after he had issued the warning ticket.

Under Fourth Amendment law, when a patrolman makes a traffic stop, he or she may request driver's documents (driver's license and vehicle registration), run a computer check, and issue a citation. "Once the driver has produced a valid license and proof that he is entitled to operate the car, 'he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.'" *United States v. Walker*, 933 F.2d 812, 816 (10th Cir.1991), *cert. denied* —— U.S. ——, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992) (*quoting United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir, 1988)). *See also Wilson*, 874 P.2d at 227. "Any further detention for questioning is beyond the scope of the *Terry* stop and therefore is illegal unless the officer has a reasonable suspicion of unlawful activity." *United States v. Dewitt*, 946 F.2d 1497, 1501–02 (10th Cir.1991), *cert. denied* —— U.S. ——, 112 S.Ct. 1233, 117 L.Ed.2d 467 (1992). *See also Wilson*, 874 P.2d at 224, (*citing United States v. Doe*, 801 F.Supp. 1562, 1579 (E.D.Tex.1992)).

Further questioning is allowed if the "encounter has turned from a detention into a consensual encounter. This occurs when a reasonable person * * * would feel free to leave." *Dewitt*, 946 F.2d at 1502. Therefore, the issue here becomes whether this was a consensual encounter or whether it was a detention that required reasonable suspicion.

The United States Supreme Court has set out the following test for "seizure" of a person:

"A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

*California v. Hodari D.,* 499 U.S. 621, 627–28, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991) (*quoting United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), and *citing Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988); *INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984)).

Utilizing this test, it is clear to me that respondents were seized. Once the driver's license and vehicle registration were taken from them, they were not free to leave. No reasonable person would feel free to leave while an officer still held their driver's license and vehicle registration. If a person made the decision to drive away, not having his driver's license in possession, the officer could pull him over again for driving without a valid driver's license in his possession. *See* W.S. 31–7–116 (Cum.Supp.1993).

During his testimony, Patrolman Dyer indicated that although he still had the driver's license and vehicle registration in his possession, respondents were free to leave because they could have walked away. Further questioning of Patrolman Dyer demonstrated how unlikely it was that respondents were free to leave:

Q. When is the last time in your 15 years of highway patrol work that you ever stopped a defendant along the highway, took his driver's license, and took his registration, and sat there and watched him walk away from you and your vehicle?

A. No one has ever done that.

When an officer retains a suspect's driver's license and registration to the vehicle, the suspect is not free to leave. *United States v. Soto,* 988 F.2d at 1555, 1557; *United States v. Walker,* 933 F.2d at 817; *United States v. Guzman,* 864 F.2d at 1519.

Respondents were not free to leave. The questions asked were not part of a consensual encounter between law enforcement and citizens, but rather were elements of an investigative detention. *United States v. Soto,* 988 F.2d at 1555 (*quoting United States v. Sokolow,* 490 U.S. at 8, 109 S.Ct. at 1585; *United States v. Ward,* 961 F.2d 1526, 1529 (10th Cir.1992)). *See also Collins v. State,* 854 P.2d 688, 691 (Wyo.1993) (three tiers of police-citizen encounters); *Wilson v. State,* 874 P.2d at 219. Since respondents were indeed the subject of an investigative detention, we must determine whether such was supported by an objectively reasonable suspicion of illegal activity. *United States v. Soto,* 988 F.2d at 1555 (*citing United States v. Sokolow,* 490 U.S. at 8, 109 S.Ct. at 1585; *United States v. Ward,* 961 F.2d at 1529).

Judge Pratt of the Second Circuit, dissenting in *United States v. Hooper,* 935 F.2d 484, 499–500 (2nd Cir.), *cert. denied* — U.S. ——, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991), noted the following conflicts in the "drug courier profile": *United States v. Nurse,* 916 F.2d 20, 24 (D.C.Cir.1990) (arriving late at night is characteristic); *Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (arriving early in morning is characteristic); *United States v. White,* 890 F.2d 1413, 1415 (8th Cir.1989), *cert. denied* 498 U.S. 825, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990) (traveling alone is characteristic); *United States v. Garcia,* 905 F.2d 557, 559 (1st Cir.), *cert. denied* 498 U.S. 986, 111 S.Ct. 522, 112 L.Ed.2d 533 (1990) (traveling with companion is characteristic); *United States v. Montilla,* 928 F.2d 583, 585 (2nd Cir.1991) (acting too nervously is characteristic); *United States v. McKines,* 933 F.2d 1412, 1414 (8th Cir.), *cert. denied* — U.S. ——, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991) (acting too calmly is characteristic). *See also* Jodi Sax, *"Drug Courier Profiles, Airport Stops and the Inherent Unreasonableness of the Reasonable Suspicion Standard after United States v. Sokolow,"* 25 Loy.L.A.L.Rev. 321, 356 (1991); Andrew Jay Flame, *"Drug Courier Profiles and Terry–Type Seizures: United States v. Hooper,* 935 F.2d 484 (2nd Cir.), *cert. denied* 112 S.Ct. 663 (1991)," 65 Temple L.Rev. 323, 332 (1992). Although Judge Pratt listed numerous other examples, I list only a few here to point out the conflicts in the "drug courier profile." Judge Pratt also cites statistics from federal agents which dis-

close that in 1989, agents made 600 stops and only ten arrests. Five hundred ninety innocent travelers were stopped merely because they met "drug courier profile" characteristics. *Hooper,* 935 F.2d at 499–500 (Pratt, J., dissenting) (cited in 65 Temple L.Rev. at 333).

Asserting that a particular characteristic fits the drug courier profile is not sufficient. Since the characteristics conflict and can also indicate innocent behavior, what must be shown is, in the unique situation, that a particular characteristic did create a reasonable objective suspicion. The danger with cursory reliance on drug courier profiles is that they may demonstrate only a subjective suspicion or hunch and the "profile," since it varies, may be molded after the fact to justify the seizure.

Prior to the detention, the patrolman had been suspicious when he erroneously concluded two vehicles were traveling together. He then observed a pickup with camper and net tailgate, a clove of garlic, a radar detector, a clean bed, the pickup was from San Diego, California, with a driver too nervous and a passenger too calm (asleep in the pickup bed). That is all. This scenario does not constitute a drug profile nor reasonable suspicion of criminal activity. The respondents were the subject of an unlawful seizure in violation of the Fourth Amendment prohibiting unlawful searches and seizures.

The district court's finding that at the time of the seizure the patrolman lacked sufficient reasonable suspicion for seizure of the persons of respondents was not clearly erroneous. The district court heard the evidence and observed the witnesses and determined that the suspicions that were observed were developed by Patrolman Dyer's further inquiries over the fifty-minute period *after* the canine unit had been summoned.

I find the Tenth Circuit's comment concerning this same patrolman's clairvoyancy in *Guzman* appropriate:

> That Officer [Dyer's] " 'hunch' about [respondents] proved correct is perhaps a tribute to his policeman's intuition, but it is not sufficient to justify, *ex post facto,* a seizure that was not objectively reasonable."

*Guzman,* 864 F.2d at 1520 (*quoting in part United States v. Smith,* 799 F.2d 704, 708 (11th Cir.1986)).

## DISTRICT COURT'S BRIGHT-LINE RULE

I dissent also from the court's rejection of the "brightline" rule relied upon by District Court Judge Hanscum. In his decision letter, the district judge stated:

> Announcing a brightline rule applicable in this judicial district, a search and seizure will not be sustained unless following the completion of the initial investigatory stop for a traffic violation, the driver's license and registration are returned and if further consent to search short of arrest is attempted, that a written consent form must be produced for the defendant's signature. Short of probable cause for arrest or consent, the defendants must be free to go, otherwise a coercive and non-consensual encounter between a private citizen and a law enforcement officer is created.

The decision letter relied on *United States v. Recalde,* 761 F.2d 1448, 1453 (10th Cir.1985) and *United States v. Guzman,* 864 F.2d at 1519–20.

The State contends that the district court's **bright-line rule** is not supported by relevant case law. The State argues that the district court is attempting to establish a **per se rule** that a specified period of detention is too long and unreasonable. I do not view the district court's ruling in that way. The district court states in its decision letter that searches and seizures conducted after a valid initial investigatory stop will not be sustained unless the driver's license and registration are returned. There is a great deal of support for that view. *United States v. Soto,* 988 F.2d at 1554, 1557; *United States v. Guzman,* 864 F.2d 1512; *State v. Hewitt,* 841 P.2d 1222, 1224 (Utah App.1992); *Commonwealth v. Lopez,* 415 Pa.Super. 252, 609 A.2d 177, 181 (1992); *State v. Stevens,* 845 S.W.2d 124, 128 (Mo.App.1993).

The Tenth Circuit Court of Appeals announced the bright-line return of driver's documents rule in *United States v. Guzman,* 864 F.2d at 1519. And many courts have

utilized the *Guzman* decision in reaching the same result. *Lopez*, 609 A.2d at 181; *Stevens*, 845 S.W.2d at 128. *United States v. Soto* is not contrary to the rule of *Guzman*. *Soto*, 988 F.2d at 1557–58. In *Soto*, the court, quoting the bright-line rule from *Guzman*, states that requiring the driver's license and registration be returned facilitates proper Fourth Amendment compliance by law enforcement. *Soto*, 988 F.2d at 1554. The court in *Soto* also acknowledges that the law requires a driver to have a valid license and registration in his or her possession and that without those items, he or she cannot legally drive away. The court in *Soto* upheld the seizure because of the unique facts in that particular case and because the consent was so clear and unequivocal. *Soto*, 988 F.2d at 1557–58. Therefore, *Soto* is not a departure from the bright-line rule that the driver's license and registration must be returned. The bright-line rule established by the district court is in fact supported by the Tenth Circuit's decision in *Soto*.

The State finally contends that under *United States v. Obregon*, 748 F.2d 1371 (10th Cir.1984), Patrolman Dyer's detention of the vehicle was justified. In *Obregon*, the car was stopped at a roadblock. 748 F.2d at 1373. The roadblock had been established to conduct routine driver's license and car registration checks, and to train law enforcement officers. *Id.* The car was rented and had expired plates, and the driver's name was not on the rental contract. *Id.* In addition, the defendant consented orally and in writing to a search of the car. The court in *Obregon* found that the officer had reasonable suspicion to detain the car. *Id.*, at 1376.

This case is quite different since Patrolman Dyer made the decision to detain the vehicle even though it was not stolen and the car had valid plates. He had no reasonable suspicion for further detention when he radioed for the drug detection dog. Respondents Welch and Michener did not consent to a search of the truck bed. The facts in this case fit more closely with those in *Guzman*, and therefore the district court's ruling was not clearly erroneous.

## CONCLUSION

The Court's decision today opens the door for the willy nilly use of drug courier profiles by law enforcement agencies in Wyoming. How many innocent travelers on our state highways will be pulled over and searched by a canine unit because they exhibit innocent conduct which fits someone's idea of a profile? Since it is usually the guilty who end up before us, we are unlikely to ever know. We should not forget the words of the late Justice Marshall:

> Because the strongest advocates of Fourth Amendment rights are frequently criminals, it is easy to forget that our interpretations of such rights apply to the innocent and the guilty alike.

*United States v. Sokolow*, 490 U.S. at 11, 109 S.Ct. at 1587 (1989) (Marshall, J., dissenting).

The police officer in this case had no more of an articulable reasonable suspicion than the officer in *Wilson*. At least in *Wilson*, the officer was acting in "the usual course of accepted law enforcement activity." *Wilson* 874 P.2d at 230 (Cardine, J., dissenting). Officer Dyer did not have a reasonable suspicion; he had a hunch. Unluckily for Welch and Michener, his hunch happened to pay off.

Counsel who argued this case alluded to the fact that this was the first time in memory that anyone had appeared seeking to uphold a trial court judge who had entered a suppression order. Now they and the judge are told "wrong again."

Since Officer Dyer did not return the driver's license and registration after writing the warning ticket, did not have consent to continue a search and interrogation, and did not have any articulable facts with which he could form a reasonable objective suspicion prior to his detaining the suspects, the evidence should be suppressed. Accordingly, I dissent.

TAYLOR, Justice, concurring.

I concur. I write separately to acknowledge the vital role of a police officer's "reasonable suspicions." The majority decisions in these appeals and in *Wilson v. State*, 874 P.2d 219 (Wyo.1994) illustrate that a seizure must only occur when an officer possesses

articulable facts which, when combined with police experience, indicate that criminal conduct is occurring or may be about to occur.

The Fourth Amendment guarantee of freedom from unreasonable searches and seizures requires fact specific inquiry by the reviewing court. *Wilson*, 874 P.2d at 219–220. The focus of the court's inquiry following a seizure for an investigative stop is the objective reasonableness of the limited seizure based upon the specific and articulable facts and reasonable inferences the police officer possessed at the time of the stop. *Terry v. Ohio*, 392 U.S. 1, 27–28, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968); *United States v. Werking*, 915 F.2d 1404, 1407 (10th Cir.1990).

In *Wilson*, the police officer, acting as a community caretaker, initially had a consensual encounter with a citizen who was having trouble walking. *Wilson*, 874 P.2d at 220. The encounter became a seizure when the police officer ordered Wilson to "wait" for the results of a computerized identification check. *Id.* at 222. The police officer admitted that he acted without a reasonable suspicion of possible criminal conduct. *Id.* at 222. Therefore, the seizure to complete the computerized identification check resulted in an intrusion into protected Fourth Amendment rights.

In this case, unlike *Wilson*, the investigating officer possessed articulable facts to justify the seizure of Welch and Michener. Patrolman Dyer stopped the pickup truck after he observed a violation of Wyo.Stat. § 31–5–217(b) (1989). The patrolman's observation gave rise to the reasonable suspicion necessary to permit a limited detention for the purposes of issuing a citation. *United States v. Walker*, 933 F.2d 812, 816 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 U.S. 1168, 117 L.Ed.2d 414 (1992); *United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir.1988). *See also United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir.1993) (holding traffic stop is not pretextual if the officer has probable cause to believe that a traffic offense has occurred, regardless of whether this was the only basis or merely one basis for the stop).

After issuing the citation, further investigatory detention required a reasonable suspicion of possible criminal behavior. The majority of this court has correctly acknowledged that even seemingly innocent conduct can give rise to a reasonable suspicion of possible criminal behavior. Inquiring whether the conduct of Welch and Michener would create an inference of possible criminal behavior in a reasonable police officer discloses the objective validity of this detention.

During the traffic stop, Patrolman Dyer observed that the ceiling of the camper shell was sagging. The plastic liner placed in the bed of the pickup was unusually clean, as if it had been recently removed, and showed signs of having been altered. These observations suggest it was a reasonable inference that contraband could be hidden in the vehicle. However, Patrolman Dyer's observations of the vehicle's condition were coupled with other articulable facts, including: the nervous behavior of the driver; the unusual indifference of the supposedly sleeping passenger; and the mispronunciation of the registered owner's name despite the evidence from the California speeding ticket that the driver used the vehicle in the past. Police experience would also indicate that the average interstate traveler does not carry a fist-sized clove of garlic in a vehicle to present an aromatic challenge to prying noses, human or canine.

A reasonable person, after observing the same facts Patrolman Dyer did, would want to make further inquiry. Patrolman Dyer did not need the vaunted drug courier profile to draw an inference that contraband might be hidden in this vehicle. Common sense was sufficient.

The investigatory stop provided a means to resolve Patrolman Dyer's reasonable suspicions without undue delay to Welch and Michener. In my opinion, this was not an unreasonable intrusion into protected Fourth Amendment rights. Therefore, I concur in the majority opinion.