2003 WY 13

**Nicholas DAMATO, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 01–88.

Supreme Court of Wyoming.

Jan. 29, 2003.

Before HILL, C.J., and GOLDEN, LEHMAN *, KITE, and VOIGT, JJ.

GOLDEN, Justice.

[¶ 1] Appellant Nicholas Damato's stop for a traffic violation led to the discovery of more than 300 pounds of marijuana in the trunk of his car. After charges were filed, the district court granted his motion to suppress this evidence; however, upon the State's motion for reconsideration, the trial court reversed its ruling. In its second ruling, the district court denied the motion to suppress the evidence upon finding that the marijuana would inevitably have been discovered by a canine drug sniff. Damato entered a conditional plea of guilty, preserving his right to appeal the evidentiary ruling, and now appeals this denial.

[¶ 2] We reverse and remand.

## ISSUES

[¶ 3] Damato states the issues as:

1. Whether the continued detention of Mr. Damato was justified by a reasonable and articulable suspicion of illegal activity.
2. Whether the district court erred in ruling that the drugs found in the trunk of Mr. Damato's vehicle would have been inevitably discovered by a canine drug unit.

The State believes the issues are:

I. Did the district court err in holding that Trooper Bauer had reasonable articulable suspicion to detain appellant for a

reasonable period of time awaiting the arrival of the drug detection dog?

II. Did the district court err in holding that the marijuana in the trunk of appellant's vehicle would have been inevitably discovered by the drug detection dog?

III. Did Trooper Bauer have independent lawful cause to search the trunk of appellant's vehicle, either as an inventory search following appellant's arrest for possession of marijuana, or based upon appellant's admission that there was marijuana in the trunk?

## FACTS

[¶ 4] The parties do not dispute the following findings of fact made by the district court:

On April 16, 2000, at approximately 3:30 p.m., Patrolman David Rettinger stopped Defendant Nicholas Damato for speeding on [east]bound Interstate 80 in Albany County, Wyoming. Defendant was traveling 82 in a 75 mile per hour zone. During the stop Patrolman Rettinger became suspicious of Defendant because he appeared unusually nervous, his luggage was in the back seat instead of the trunk, and there was an unusual quantity of fast food wrappers on the passenger floorboard of the vehicle. Patrolman Rettinger also noticed discrepancies in Damato's answers to where he had rented the car and where he was headed to. Damato told Patrolman Rettinger that he had rented the car in San Francisco and that he was returning to his home in Illinois, when the rental agreement showed that the car was rented in San Diego and was to be dropped off in Omaha. All of these observations led Patrolman Rettinger to be suspicious of Mr. Damato. Patrolman Rettinger then requested to search the vehicle and Damato refused. Patrolman Rettinger, believing he could not detain Damato any longer, allowed him to leave without issuing a citation for speeding.

Patrolman Rettinger then radioed the highway patrol dispatch to inform other

* Chief Justice at time of oral argument

officers of his observations and to ask other officers to look for the vehicle. He told Patrolman Bauer that the driver did not consent to a search, which inferred the officer was looking for drugs. Patrolman John Bauer was one of the officers who received the call. He proceeded to head eastbound on I–80, trying to "get probable cause to stop him," when he identified a vehicle he believed to be Defendant's.... Patrolman Bauer, in an effort to look like he was ignoring Damato, went on past the car before he turned around. Patrolman Bauer then followed the vehicle, looking for probable cause, until he was able to lock Damato's vehicle in on radar traveling 77 in a 75 mile per hour zone. Patrolman Bauer then closed in on Damato, who moved right to get out of the patrol car's way, and Patrolman Bauer turned on his lights. Patrolman Bauer noted that at this point, Damato had also not used his turn signal for 100 feet prior to changing lanes. Patrolman Bauer then stopped the vehicle.

Patrolman Bauer called for the canine unit and then proceeded to the vehicle. Patrolman Bauer then asked to see Defendant's license, registration, and proof of insurance. Defendant questioned why he had been stopped saying he did not believe he was speeding and that he had been careful since he had just been pulled over by Patrolman Rettinger. As Defendant reached for the glove box to retrieve the documents, he said something about them being in the "trunk" and then corrected himself. At this point, Patrolman Bauer noticed the wrappers on the floor and luggage in the backseat, while also observing the Defendant was unusually nervous. Additionally Patrolman Bauer noticed Visine on the console and that Defendant appeared to have pink "dope" eyes.

Patrolman Bauer then directed Damato to get out of the car to come look at the radar.[1] The officer testified that Mr. Damato was not free to leave at this time as the patrolman still had possession of his license and other documents. As Damato reached the back of the vehicle, Patrolman Bauer did a pat-down search. Patrolman Bauer justified this action by saying it was for his own safety since Damato was going to be getting into the front seat of the patrol car. The pat-down revealed two small, ordinary pocket knives, and Patrolman Bauer felt what he believed to be marijuana in a cellophane bag in Defendant's right, back pocket. Patrolman Bauer then asked Damato what was in his pocket, and after fumbling around, and being asked again, Defendant pulled a cellophane bag with approximately 3 grams of marijuana in it out of his pocket.

Defendant was then arrested and the canine units were called again, along with DCI. Patrolman Bauer then read Defendant his *Miranda* warnings. Defendant did not appear to orally or otherwise agree to answer questions, but he acknowledged that he understood his rights and later answered questions from Patrolman Bauer. Patrolman Bauer told Defendant repeatedly that Defendant could help himself now by telling Patrolman Bauer what was in the car, and that he would find out anyway when he did an inventory of the car. After repeated questions and repeated denials, Defendant told Patrolman Bauer first that there was a marijuana cigarette in the console of the vehicle, and later that the trunk was full of marijuana. Defendant was subsequently arrested for possession of marijuana with intent to deliver. No citations were issued for the traffic violations or the misdemeanor possession of marijuana.

---

1. In the discussion portion of its order, the district court found:

> [Patrolman Bauer] did not wait for the dogs, instead he directed Damato to exit the vehicle, and to proceed to the patrol car to view the radar displaying 77 m.p.h. Although Patrolman Bauer testified his action was justified because Mr. Damato "requested [to see the] radar," the Highway Patrol videotape of the stop does not disclose such a request. Bauer further testi-

> fied that Damato "made a little argument about the speeding," so he offered to show Damato the radar. I have carefully reviewed the videotape of the stop and have played it back several times. I do not see or hear Defendant arguing or requesting to see the radar on the tape. Defendant reacted with a sense of bafflement over the stop, no different than any driver. He did not resist the officer's questions and cooperated as any driver would.

After making these findings of fact, the district court determined that

> Standing alone, the Visine, the litter on the floor, the suitcase in the rear seat do not give rise to the level of conduct which would justify a finding of articulable suspicion. However, when the false information about the point of origin and destination is added to the mix, the facts support a suspicion that the defendant is transporting something that may be evidence of criminal activity.
>
> When the trooper ordered the drug sniffing dogs he would have been justified in detaining the defendant until the dogs arrived. However, he did not wait for the dogs, instead he directed Damato to exit the vehicle, and to proceed to the patrol car to view the radar ....

[¶ 5] The district court determined that the trooper improperly ordered Damato from the car and the subsequent pat-down required that the motion to suppress be granted. The State filed for reconsideration, contending that the inevitable discovery doctrine applied because the marijuana in the trunk would have been discovered by the canine sniff that had been ordered. Following a hearing that established the reliability of the particular dog, the district court denied the motion to suppress.

[¶ 6] Damato entered a conditional plea of guilty and was sentenced to four and one-half to nine years and fined $10,000.00. This appeal followed.

## DISCUSSION

[¶ 7] Our standard of review was stated in *McChesney v. State,* 988 P.2d 1071, 1074 (Wyo.1999):

> Findings on factual issues made by the district court considering a motion to suppress are not disturbed on appeal unless they are clearly erroneous. *Wilson v. State,* 874 P.2d 215, 218 (Wyo.1994). Since the district court conducts the hearing on the motion to suppress and has the opportunity to assess the credibility of the witnesses, weigh the evidence, and make the necessary inferences, deductions, and conclusions, evidence is viewed in the light

most favorable to the district court's determination. *Id.* The issue of law, whether an unreasonable search or seizure has occurred in violation of constitutional rights, is reviewed de novo. *Id.; Brown v. State,* 944 P.2d 1168, 1170–71 (Wyo.1997).

[¶ 8] A state constitutional analysis is required unless a party desires to have an issue decided solely under the Federal Constitution. *Vasquez v. State,* 990 P.2d 476, 485 (Wyo.1999). Damato limits his analysis to the Fourth Amendment of the Federal Constitution. That amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

> The touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security. Reasonableness, of course, depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.

*Pennsylvania v. Mimms,* 434 U.S. 106, 108–09, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977) (per curiam) (quotation marks and citations omitted); *see also, Illinois v. McArthur,* 531 U.S. 326, 331–32, 121 S.Ct. 946, 950, 148 L.Ed.2d 838 (2001).

[¶ 9] A traffic stop is a "seizure" within the meaning of the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). However, a routine traffic stop is more analogous to an investigative detention than a custodial arrest and such stops are analyzed under the principles developed for investigative detentions set forth in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

> "The investigatory stop represents a seizure which invokes Fourth Amendment safeguards, but, by its less intrusive character, requires only the presence of specific and articulable facts and rational inferences which give rise to a reasonable suspicion that a person has committed or

may be committing a crime." *Wilson*, 874 P.2d at 220 (citing *Lopez v. State*, 643 P.2d 682, 683 [ (Wyo.1982) ] ); *see also Putnam* [*v. State* ], 995 P.2d [632] at 637 [ (Wyo.2000) ]; and *McChesney v. State*, 988 P.2d 1071, 1074 (Wyo.1999). We have a dual inquiry for evaluating the reasonableness of an investigatory stop: (1) whether the officer's actions were justified at the inception; and (2) whether it was reasonably related in scope to the circumstances that justified the interference in the first instance. *Wilson*, 874 P.2d at 223 (quoting *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879); *see also United States v. Hensley*, 469 U.S. 221, 228, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985). An officer's conduct is judged by an objective standard which takes into account the totality of the circumstances. *Putnam*, 995 P.2d at 637; *Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1879–81; *United States v. Lang*, 81 F.3d 955, 965 (10th Cir.1996).

*Martindale v. State*, 2001 WY 52, ¶ 11, 24 P.3d 1138, ¶ 11 (2001). In applying this test, the Court has "consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry." *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996). "The government has the burden of demonstrating that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir.1993) (quotation marks omitted).

[¶ 10] The mandated two-part inquiry requires that we first determine whether the stop was justified at its inception. Our inquiry is limited to Officer Bauer's stop. Officer Bauer testified that the information he received from Officer Rettinger motivated him to search for Damato's car and, after finding it, follow it with the intent to find probable cause to stop it and detain it for a canine drug sniff. The Court has been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers and has held unanimously that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996). *Whren* held that "a traffic-violation arrest ... [will] not be rendered invalid by the fact that it was 'a mere pretext for a narcotics search.' " *Id.* (citing *United States v. Robinson*, 414 U.S. 218, 221 n. 1, 94 S.Ct. 467, 470 n. 1, 38 L.Ed.2d 427 (1973)). The Court later confirmed the validity of *Whren* in *Arkansas v. Sullivan*, 532 U.S. 769, 771–72, 121 S.Ct. 1876, 1878, 149 L.Ed.2d 994 (2001) (per curiam), reversing the Arkansas Supreme Court's decision that a legitimate traffic stop was invalid when motivated for the purpose of conducting a search for drugs. A concurring opinion written by Justice Ginsburg in *Sullivan* noted that the Arkansas court feared the *Whren* decision would accord police officers disturbing discretion to intrude on individuals' liberty and privacy. *Id.* at 772–73, 121 S.Ct. at 1879 (Ginsburg, J., concurring). The Arkansas Court had expressed unwillingness "to sanction conduct where a police officer can trail a targeted vehicle with a driver merely suspected of criminal activity, wait for the driver to exceed the speed limit by one mile per hour, arrest the driver for speeding, and conduct a full-blown inventory search of the vehicle with impunity." *Id.* The concurring opinion also noted that the Court has held that such exercises of official discretion are unlimited by the Fourth Amendment and cited *Whren* and *Atwater v. Lago Vista*, 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001).

[¶ 11] The Court clarified that had the Arkansas Supreme Court decided that it could not apply *Whren* under its own state constitution, the Court would not interfere. *Sullivan*, 532 U.S. at 772, 121 S.Ct. at 1878. The concerns of the Arkansas Supreme Court are also ours where, as here, the officer intended to use any traffic violation as a pretext to conduct a narcotics investigation; however, because Damato does not contend that the Wyoming Constitution provides greater protection in this area, we must follow the federal constitutional decisions in *Whren* and *Sullivan*.

[¶ 12] In addition to pretextual reasons, we are concerned also that Damato had previously been stopped and released, and, in a "tag-team" fashion, was passed on to the

next jurisdiction to be stopped in hopes the subsequent officer would be more successful in obtaining a canine sniff within a reasonable time. Limited to a federal constitutional analysis, we are constrained to say *Whren* is controlling in this particular case because Officer Bauer stopped Damato for an observed traffic violation. The officer activated his patrol car lights to stop Damato after observing on radar that Damato exceeded the maximum allowable speed limit by two miles per hour in violation of Wyo. Stat. Ann. § 31–5–301. Under Wyoming statute, exceeding the maximum allowable speed limit is a misdemeanor punishable by fines and/or imprisonment. Wyo. Stat. Ann. § 31–5–1201 (LexisNexis 2001). Officer Bauer, therefore, had probable cause to stop Damato because he had observed a traffic violation. *Whren,* 517 U.S. at 810, 116 S.Ct. at 1772.

[¶ 13] Having found that the initial stop was valid, we must examine the second prong of *Terry,* "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. at 20, 88 S.Ct. at 1879. "In the course of making a routine traffic stop, a law enforcement officer may: request a driver's license and vehicle registration; run a computer check; and issue a citation." *Burgos–Seberos v. State,* 969 P.2d 1131, 1133 (Wyo.1998) (citing *United States v. Elliott,* 107 F.3d 810, 813 (10th Cir.1997)); *see also, Wilson,* 874 P.2d at 224. Generally, the driver must be allowed to proceed without further delay once the officer determines that the driver has a valid license and is entitled to operate the vehicle. *Burgos–Seberos,* 969 P.2d at 1133. "In the absence of the particular individual's valid consent, an officer may expand an investigative detention only if there exists an 'objectively reasonable and articulable suspicion' that criminal activity has occurred or is occurring." *United States v. Williams,* 271 F.3d 1262, 1267 (10th Cir. 2001), *cert. denied,* 535 U.S. 1019, 122 S.Ct. 1610, 152 L.Ed.2d 624 (2002) (citing *United States v. Hunnicutt,* 135 F.3d 1345, 1349 (10th Cir.1998)). "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant

that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880.

[¶ 14] Even though the initial stop was justified, we must still assess the reasonableness of the subsequent pat-down search. In order to comport with the Fourth Amendment, that search must have been "reasonably related in scope" to the basis for the stop, which in this case was a traffic violation. *Id.* at 20, 88 S.Ct. at 1879. In that regard, the Court states that an officer may remove occupants from the vehicle and may conduct a pat-down search if he or she harbors an articulable and reasonable suspicion that the person is armed and dangerous. *Knowles v. Iowa,* 525 U.S. 113, 117–18, 119 S.Ct. 484, 488, 142 L.Ed.2d 492 (1998) (citing *Mimms,* 434 U.S. at 111, 98 S.Ct. at 334–35, and *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883). In this case, the district court stated:

> The Fourth Amendment balances the nature and quality of the intrusion against the importance of the governmental interests alleged to justify the intrusion. *U.S. v. Hensley,* 469 U.S. 221, 226, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). "The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " *Mimms,* 434 U.S. at 108–9, 98 S.Ct. 330, citing *Terry v. Ohio,* 392 U.S. at 19, 88 S.Ct. 1868. The governmental interest in directing Damato to view the monitor and hence frisk him must outweigh a citizen's right to be free from unreasonable intrusion. Officer Bauer does not adequately explain the necessity of having Damato view the monitor, nor does he explain why such viewing necessitated Damato to sit in the patrol car for viewing, when the monitor was plainly visible from outside the car. I have no choice but to conclude that the State has failed to justify the intrusion.

The district court granted the motion to suppress. We agree with the district court's decision that Damato was unlawfully seized when he was commanded to exit his car and "frisked." As the district court determined, although the officer could have removed

Damato from the vehicle for the sake of safety, the officer had no objectively based suspicion that Damato was armed and dangerous, and the subsequent pat-down search he performed violated Damato's Fourth Amendment rights. Thus, the product of the pat-down and everything thereafter must be suppressed as fruit of the poisonous tree. *McChesney*, 988 P.2d at 1078.

[¶ 15] The State again argues that, upon stopping Damato by activating his lights, Officer Bauer immediately called for the canine drug unit, and the drug discovery was inevitable. The record shows that the canine drug unit was called for at 10:27 a.m. and arrived at 11:11 a.m., some forty-four minutes after Damato was first stopped. This detention period is beyond that necessary to complete a routine traffic stop and, thus, must be justified by articulable, reasonable suspicion of criminal activity. *Williams*, 271 F.3d at 1267–68. The district court determined that, based on the information provided to Officer Bauer by Officer Rettinger, reasonable suspicion existed that would have justified detaining Damato until the canine unit arrived. Ultimately, the district court determined that the inevitable discovery doctrine applied and denied the motion to suppress. We disagree with the district court's determination that Officer Bauer had reasonable suspicion that justified Damato's prolonged detention and find that the inevitable discovery doctrine is inapplicable to these facts.

[¶ 16] We find that the analysis of the factors supporting reasonable suspicion should be governed by *United States v. Wood*, 106 F.3d 942 (10th Cir.1997). As the Tenth Circuit stated in *Wood*, we must determine if the totality of the circumstances demonstrates the existence of objectively reasonable suspicion of illegal activity. *Id.* at 946.

The "whole picture" must be taken into account. Common sense and ordinary human experience are to be employed, and deference is to be accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions. Inchoate suspicions and unparticularized hunches, however, do not provide reasonable suspicion. Even though reasonable suspicion may be founded upon factors consistent with innocent travel, some facts must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous. We therefore examine, both individually and in the aggregate, the factors found by the trooper and the district court to give rise to reasonable suspicion to detain....

*Id.* (citations and quotation marks omitted).

[¶ 17] The Court has said:

Articulating precisely what "reasonable suspicion" and "probable cause" mean is not possible. They are commonsense, nontechnical conceptions that deal with " 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)); see *United States v. Sokolow*, 490 U.S. 1, 7–8, 109 S.Ct. 1581, 1585–1586, 104 L.Ed.2d 1 (1989). As such, the standards are "not readily, or even usefully, reduced to a neat set of legal rules." *Gates, supra*, at 232, 103 S.Ct. at 2329. We have described reasonable suspicion simply as "a particularized and objective basis" for suspecting the person stopped of criminal activity, *United States v. Cortez*, 449 U.S. 411, 417–418, 101 S.Ct. 690, 694–695, 66 L.Ed.2d 621 (1981), and probable cause to search as existing where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found, see *Brinegar, supra*, at 175–176, 69 S.Ct. at 1310–1311; *Gates, supra*, at 238, 103 S.Ct. at 2332.

*Ornelas v. United States*, 517 U.S. 690, 695–96, 116 S.Ct. 1657, 1661, 134 L.Ed.2d 911 (1996).

[¶ 18] The Tenth Circuit has recently distinguished between reasonable suspicion and probable cause:

Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that

required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*United States v. Tuter,* 240 F.3d 1292, 1296 n. 2 (10th Cir.), *cert. denied,* 534 U.S. 886, 122 S.Ct. 195, 151 L.Ed.2d 137 (2001) (citing *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)).

[¶ 19] Assuming without deciding that the collective knowledge of Officer Bauer and Rettinger could be aggregated to permit Officer Bauer to call for the canine unit immediately upon stopping Damato, the district court found that the evidence indicated that the following factors during Officer Rettinger's stop created Officer's Bauer's suspicion of criminal activity:

1) Damato seemed unusually nervous for a routine traffic stop;

2) Damato told the patrolman that the car was rented from San Francisco instead of San Diego, which is a known drug hub;

3) Damato said that he was taking the car home to Illinois when it was to be dropped off in Omaha;

4) Damato's luggage was in the back seat instead of the trunk;

5) many fast food wrappers on the passenger floorboard suggested Damato was on a "hard run"; and

6) Damato did not consent to the search which caused Patrolman Rettinger to suspect drugs.

"The failure to consent to a search cannot form any part of the basis for reasonable suspicion." *Wood,* 106 F.3d at 946. Thus, the last factor has no place in our determination.

[¶ 20] The "extreme nervousness" factor is generally considered of limited significance. In *Wood,* the court noted that is not uncommon for most citizens whether innocent or guilty to exhibit signs of nervousness when confronted by a law enforcement officer who is making a subjective assessment of a person with whom he had no prior acquaintance and cannot compare with his usual demeanor. *Id.* at 948. The court stated that

it had "repeatedly held that nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on nervousness as a basis for reasonable suspicion must be treated with caution." *Id.* Officer Rettinger provided the following descriptive account of Damato's nervousness:

Q. In the course of contacting him did you ask him for his driver's license and registration?

A. Yes, sir. And as I asked for that information, I asked a number of other questions. He started to seem somewhat not normal than from someone on a normal traffic stop.

Q. Could you explain to the Court what you mean by that? What do you mean by "not normal?"

A. Most people are very comfortable—or I shouldn't say very comfortable, but they're somewhat comfortable with what law enforcement's role is and what we do. They don't seem to be very surprised when they're pulled over or of that nature. I have experienced some people that live in different parts of the world or the nation where they do have fear of police, and they will act somewhat like that. But he didn't seem to have any reason to be acting somewhat kind of jerky, unsure about his questions, really methodically thinking out what he was telling me or saying.

Q. When you asked him for his driver's license and his registration, was that early on in the stop you did that?

A. Yes, yes, right away, just like I normally would ask anyone who I stop.

[¶ 21] It is generally accepted that nervousness upon the initial confrontation is normal and the telling information is whether the citizen calmed after the initial few minutes of the encounter. "Extreme and continued nervousness, however, 'is entitled to somewhat more weight.'" *Williams,* 271 F.3d at 1268 (quoting *United States v. West,* 219 F.3d 1171, 1179 (10th Cir.2000)). *Williams* distinguished its facts from *Wood* in this manner:

[In] *Wood,* [the] panel concluded that the officer's testimony as to the defendant's

rapid breathing, trembling hands, and throat-clearing constituted a mere "generic claim of nervousness," and therefore discounted the nervousness as a factor in its reasonable suspicion analysis. 106 F.3d at 948. In *Wood,* however, the officer and the defendant engaged in casual conversation, including a discussion of the good rate the defendant had received on the rental car. *Id.* at 944. Thus, *Wood* appears to have involved the more common situation where a citizen exhibits initially "signs of nervousness when confronted by a law officer," *id.* at 948, but then tends to "settle down" as the traffic stop continues. *See West,* 219 F.3d at 1179.

In this case, the district court found credible the officer's testimony that Mr. Williams' extreme nervousness did not dissipate throughout the entire stop. Given our standard of review, the record supports the district court's finding that Mr. Williams' nervousness exceeded that of the average citizen during a routine traffic stop. While we do recognize that "nervousness alone cannot support reasonable suspicion of criminal activity," *United States v. Salzano,* 158 F.3d 1107, 1113 (10th Cir.1998) (citing *United States v. Fernandez,* 18 F.3d 874, 880 (10th Cir. 1994)), we see no reason in this case to ignore Mr. Williams' nervousness in reviewing the totality of the circumstances. *See West,* 219 F.3d at 1179.

*Williams,* 271 F.3d at 1268–69.

[¶ 22] Officer Rettinger testified that he returned to his patrol car, ran a criminal history and found that Damato's record and driver's license status was clear. The officer then returned to Damato and completed a warning for speeding. He returned Damato's paperwork and then leaned in and asked if Damato would be willing to answer a few questions.

Q. What did you ask him?

A. I asked him if he was sure about where the vehicle was coming to and going from, since the documents said differently. He became very nervous as I was asking.

[¶ 23] By this, Officer Rettinger explained that he observed Damato sweating heavily although it was a chilly day, his carotid artery pulsating hard and fast, and an inability to keep eye contact. Although this descriptive account supplies more than a generic claim of nervousness, it in and of itself remains of limited significance given that Officer Rettinger at the time that he observed these matters was asking Damato whether he had any large amounts of money or drugs in the vehicle and whether Damato would permit him to search. Upon Damato's refusal, the officer asked Damato whether there was some reason he did not want the officer looking in the vehicle. Realistically, few citizens would not have become uncomfortable to some degree with these questions. The evidence does not indicate that the officer treated the stop as a routine traffic stop and, despite this, Damato's nervousness continued throughout the stop without ceasing. We believe Damato's reaction to the officer's behavior was as consistent with innocence as with criminal activity, and we, therefore, find this factor of no significance.

[¶ 24] Damato stated that he had rented the car in San Francisco, although the rental agreement indicated that he had rented it in San Diego, and was "going home" to Illinois, although the rental documents showed that he would be leaving the car in Omaha, Nebraska. Officer Rettinger testified that he knew that both San Diego and Omaha were "known drug hubs." Few large cities in the western states are not "known drug hubs." [2] The rental document information likely would have been equally signifi-

---

2. "Standing alone, a vehicle that hails from a purported known drug source area is, at best, a weak factor in finding suspicion of criminal activity. In this Circuit alone, police testimony has identified an extremely broad range of known 'drug source areas.' *See, e.g., United States v. Nicholson,* 144 F.3d 632, 638 (10th Cir.1998) (identifying the entire West Coast as a drug source area); *United States v. Scarborough,* 128 F.3d 1373, 1378 (10th Cir.1997) (Colorado);

*Wood,* 106 F.3d at 947 (California); *United States v. Garrett,* 47 F.Supp.2d 1257, 1265 (D.Kan. 1999) (Texas); *see also United States v. Beck,* 140 F.3d 1129, 1138 & n. 3 (8th Cir.1998) (collecting cases and noting that law enforcement officers have identified a number of drug supply states and a significant number of the largest cities in the United States as "drug source cities")." *Williams,* 271 F.3d at 1270.

cant to the officers because it showed that Damato had rented the car in San Diego and was ending his trip in Omaha although his driver's license showed that his home was in Illinois. Although proper documentation of ownership or legal possession of a vehicle can be crucial in ascertaining whether criminal activity is in progress, Officer Rettinger did not believe that Damato possessed a stolen car, and the failure to ask Damato for an explanation about the discrepancies requires that we find that the officer based suspicion upon mere inconsistency, which is prohibited.

[¶ 25] Finally, the luggage in the back seat and fast food wrappers on the car floor can be said to describe "a very large category of presumably innocent travelers and any suspicion associated with these items is virtually nonexistent." *Wood,* 106 F.3d at 947 (citation omitted).

[¶ 26] Although we have decided that each of these factors are innocent, under the totality of the circumstances test, individually innocuous factors can combine to arouse a reasonable suspicion for the experienced officer. *Id.* at 948. In this case, however, none of these factors were sufficient to arouse a reasonable suspicion on the part of Officer Rettinger. Because Officer Bauer relied on these factors when he called for the canine unit immediately upon stopping Damato, intending to detain him for that purpose, and without conducting his own investigation first, we must conclude that Damato was detained without reasonable suspicion.

[¶ 27] That Damato was illegally transporting a large amount of marijuana is undisputed; however, few decisions on Fourth Amendment issues vindicate innocent people. It has been said that the "safeguards of liberty have frequently been forged in controversies involving not very nice people." *United States v. Rabinowitz,* 339 U.S. 56, 69, 70 S.Ct. 430, 436, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting). In performing our duty of properly applying Fourth Amendment law to this case, we are obligated to ignore Damato's guilt and focus our analysis on the state action that led to his arrest.

[¶ 28] The illegal detention and subsequent impermissible seizure and pat-down search require suppression of the evidence.

The State does not argue that the inevitable discovery doctrine applies when no reasonable suspicion existed for calling a canine unit, and we do not address that doctrine. *See United States v. Buchanon,* 72 F.3d 1217 (6th Cir.1995). The order denying the suppression motion is reversed, and this case is remanded to the district court, where Damato "shall be allowed to withdraw" his plea of guilty. W.R.Cr.P. 11(a)(2).

HILL, C.J., files a dissenting opinion.

HILL, Chief Justice, dissenting.

[¶ 29] I respectfully dissent because I see the majority's proposed decision as an inexplicable departure from our established precedents, as well as a divergence from the nation-wide developments in this area of the law.

[¶ 30] As a point of embarkation I think it is of value to set out in more detail our holding in *State v. Welch,* 873 P.2d 601 (Wyo. 1994). After a detailed recitation of the facts and circumstances, which bear a significant resemblance to the facts and circumstances of this case, we determined that the detention of Welch was pursuant to a lawful and permissible traffic stop. As was the case in *Welch,* the evidence used to prove Damato's guilt was the fruit of a search of his person and automobile, incidental to a traffic stop on Interstate 80:

The respondents assert that many, if not all, of Patrolman Dyer's observations were as consistent with innocence as they were with guilt. We embrace the doctrine that even conduct which is wholly lawful and seemingly innocent may form the basis for a reasonable suspicion that criminal activity is afoot. *United States v. Sokolow,* 490 U.S. 1, 6–8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *United States v. Glover,* 957 F.2d 1004, 1013 (2d Cir.1992). Patrolman Dyer did not necessarily attribute this stop and his suspicion that the respondents were drug couriers to his drug profile training, though he had received such training. Rather, he credited his knowledge of, and experience with, similar arrests where, in fact, circumstances such as those he observed that day were correctly

put together to form reasonable articulable suspicions.

The respondents rely upon several Tenth Circuit Court of Appeals cases, but those cases are not in point. In each case, the Tenth Circuit Court found that reasonable articulable suspicions were lacking, which was not the situation here. *See United States v. Walker*, 933 F.2d 812 (10th Cir.1991), cert. denied, 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992) (suspect acted nervous); *United States v. Guzman*, 864 F.2d 1512 (10th Cir.1988) (stop made on the basis of a hunch in the middle of New Mexico's August desert heat; suspect nervous); and *United States v. Recalde*, 761 F.2d 1448 (10th Cir.1985) (stop made on the basis of a hunch alone). The Tenth Circuit decision which is most relevant to our inquiry today is *United States v. Soto*, 988 F.2d 1548 (10th Cir. 1993). In that case, the Tenth Circuit Court distinguished *Walker, Guzman*, and *Recalde* and found that a police officer's observations that the suspect was "panicky" and unable to give an address for his uncle from whom he had borrowed the car which he was driving formed the basis of a reasonable articulable suspicion. In the case here, Patrolman Dyer had a list of circumstances which far exceeded the circumstances enumerated in *Soto* and the other cases cited in *Soto* (*e.g., United States v. Corral*, 899 F.2d 991 (10th Cir. 1990) (spare tire out of place and bulge in spare tire well)). *Soto*, 988 F.2d at 1555.

The critical question which we must answer in more detail is whether Patrolman Dyer violated the respondents' constitutional rights by detaining them along the highway for approximately fifty minutes while he concluded his investigation.

The case of *United States v. Hardy*, 855 F.2d 753 (11th Cir.1988), cert. denied, 489 U.S. 1019, 109 S.Ct. 1137, 103 L.Ed.2d 198 (1989), is directly in point. In assessing the reasonableness of a fifty-minute detention in that case of a suspected drug courier by the Georgia State Patrol, the court said:

The Georgia State Patrol could not have anticipated appellants' journey, and appellants make no suggestion that every state trooper must be accompanied by a narcotics dog. The state patrol did have a trained dog available within twenty-five miles, a distance we find sufficiently short given the rural nature of the area. 855 F.2d at 760.

In *Glover*, the court held that a thirty-minute detention at a bus terminal in Buffalo, New York, while officers awaited arrival of the narcotics dog, was not unreasonable. 957 F.2d at 1013; and *see Cresswell v. State*, 564 So.2d 480 (Fla. 1990) (tacitly approving approximately forty-five-minute detention to await arrival of narcotics dog); and 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.2(f) (2d ed. 1987 & Supp.1993).

Given the circumstance that the stop in this case was made six miles east of Laramie and that a narcotics dog was transported to the scene with dispatch from twenty-five miles west of Laramie, we hold that the detention here was not unreasonable in any respect.

In summary, we hold that the district court erred in suppressing evidence obtained as a result of the "canine sniff" of the respondents' vehicle. The initial stop was lawful and was followed by a minimally intrusive detention of the vehicle and the respondents on a reasonably articulable suspicion premised upon objective facts indicating that the respondents' vehicle contained contraband. We specifically reject the bright line rule adopted by the trial court for its judicial district. The reasonableness of the detention is to be measured by whether the police acted diligently under all the circumstances of the case and whether the detention involved delay unnecessary to a legitimate police inquiry. *United States v. Sharpe*, 470 U.S. 675, 683–88, 105 S.Ct. 1568, 1574–76, 84 L.Ed.2d 605 (1985).

*Welch*, 873 P.2d at 604–605.

[¶ 31] Justice Taylor's concurring opinion [1] augmented this Court's analysis of the *Welch* case:

1. I also acknowledge that Justices Golden and Cardine dissented in the *Welch* case.

I concur. I write separately to acknowledge the vital role of a police officer's "reasonable suspicions." The majority decisions in these appeals and in *Wilson v. State*, 874 P.2d [215,] 219 (Wyo.1994) illustrate that a seizure must only occur when an officer possesses articulable facts which, when combined with police experience, indicate that criminal conduct is occurring or may be about to occur.

The Fourth Amendment guarantee of freedom from unreasonable searches and seizures requires fact specific inquiry by the reviewing court. *Wilson*, 874 P.2d at 219–220. The focus of the court's inquiry following a seizure for an investigative stop is the objective reasonableness of the limited seizure based upon the specific and articulable facts and reasonable inferences the police officer possessed at the time of the stop. *Terry v. Ohio*, 392 U.S. 1, 27–28, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968); *United States v. Werking*, 915 F.2d 1404, 1407 (10th Cir.1990).

In *Wilson*, the police officer, acting as a community caretaker, initially had a consensual encounter with a citizen who was having trouble walking. *Wilson*, 874 P.2d at 220. The encounter became a seizure when the police officer ordered Wilson to "wait" for the results of a computerized identification check. *Id.* at 222. The police officer admitted that he acted without a reasonable suspicion of possible criminal conduct. *Id.* at 222. Therefore, the seizure to complete the computerized identification check resulted in an intrusion into protected Fourth Amendment rights.

In this case, unlike *Wilson*, the investigating officer possessed articulable facts to justify the seizure of Welch and Michener. Patrolman Dyer stopped the pickup truck after he observed a violation of Wyo. Stat. § 31–5–217(b) (1989). The patrolman's observation gave rise to the reasonable suspicion necessary to permit a limited detention for the purposes of issuing a citation. *United States v. Walker*, 933 F.2d 812, 816 (10th Cir.1991), cert. denied, 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992); *United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir.1988). *See also United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir.1993) (holding traffic stop is not pretextual if the officer has probable cause to believe that a traffic offense has occurred, regardless of whether this was the only basis or merely one basis for the stop).

After issuing the citation, further investigatory detention required a reasonable suspicion of possible criminal behavior. The majority of this court has correctly acknowledged that even seemingly innocent conduct can give rise to a reasonable suspicion of possible criminal behavior. Inquiring whether the conduct of Welch and Michener would create an inference of possible criminal behavior in a reasonable police officer discloses the objective validity of this detention.

During the traffic stop, Patrolman Dyer observed that the ceiling of the camper shell was sagging. The plastic liner placed in the bed of the pickup was unusually clean, as if it had been recently removed, and showed signs of having been altered. These observations suggest it was a reasonable inference that contraband could be hidden in the vehicle. However, Patrolman Dyer's observations of the vehicle's condition were coupled with other articulable facts, including: the nervous behavior of the driver; the unusual indifference of the supposedly sleeping passenger; and the mispronunciation of the registered owner's name despite the evidence from the California speeding ticket that the driver used the vehicle in the past. Police experience would also indicate that the average interstate traveler does not carry a fist-sized clove of garlic in a vehicle to present an aromatic challenge to prying noses, human or canine.

A reasonable person, after observing the same facts Patrolman Dyer did, would want to make further inquiry. Patrolman Dyer did not need the vaunted drug courier profile to draw an inference that contraband might be hidden in this vehicle. Common sense was sufficient.

The investigatory stop provided a means to resolve Patrolman Dyer's reasonable suspicions without undue delay to Welch and Michener. In my opinion, this was not an unreasonable intrusion into protected

Fourth Amendment rights. Therefore, I concur in the majority opinion.

*Welch,* 873 P.2d at 611–612; and *see Perry v. State,* 927 P.2d 1158, 1160–66 (Wyo.1996).

[¶ 32] Turning now to the case at hand, these are the facts I have gleaned from a review of the transcripts and the audio/video tape that captured the arrest from beginning to end. On April 16, 2000, State Trooper David Rettinger, a patrolman with nine years of experience, stopped Damato for speeding near Mile Post 330 on I–80. Rettinger observed that Damato's behavior was not normal for that of someone merely stopped for speeding: "Most people are very comfortable—or I shouldn't say very comfortable, but they're somewhat comfortable with what law enforcement's role is and what we do. They don't seem very surprised when they're pulled over or of that nature .... But he didn't seem to have any reason to be acting somewhat jerky, unsure about his questions, really methodically thinking out what he was telling me or saying."

[¶ 33] As is routine, Rettinger asked for Damato's driver's license and registration. Damato responded that he was driving a leased vehicle and fumbled to find the papers, which Rettinger could see inside the car. Rettinger pointed them out, and Damato handed them to him. The vehicle was a rented, rather than leased, vehicle, and Rettinger considered that significant because most people know the difference (*i.e.,* that a rental car is used to drive from point A to point B, whereas a leased car is usually kept for a lengthier period of time). Rettinger also asked where he had rented the vehicle and where he was going with it. Damato said he was coming from San Francisco and going home (according to his driver's license, Illinois was Damato's home). The paperwork for the vehicle indicated that it was rented in San Diego and was to be dropped off in Omaha. In addition, Rettinger observed there was an abundance of fast food wrappers on the floor of the car, and in his experience and training that suggested the person was "traveling hard." Rettinger considered it significant that Damato's luggage was in the back seat rather than in the trunk of the large luxury automobile. As Rettinger

returned Damato's paperwork and gave a warning ticket to him, he leaned into Damato's car and asked if he would be willing to answer a few questions, and Damato said he would. Rettinger questioned Damato about the discrepancies with respect to where Damato rented the car and where he was going with it. As he did so, Rettinger noted that Damato became very nervous and, when asked to be specific by the trial court, Rettinger said: "I seen the temple on top of his head start to bead" [later testimony clarified that Damato's carotid artery was "pulsating hard and fast."]. I seen the neck beading heavily. He was sweating, that he had taken a handkerchief and wiped the top of his head. It was a cool day with the wind blowing very strong. In fact, it was a bit chilly." Damato could not maintain eye contact with Rettinger. Rettinger asked if Damato would let him search his vehicle and Damato declined. Rettinger then felt he had to let Damato go on his way and that is what he did.

[¶ 34] However, Rettinger had second thoughts about Damato. All of his experience and training made him suspect that something was wrong (i.e., that Damato might be a drug mule), so he contacted State Trooper John Bauer, who was in Cheyenne, and relayed to him all the information he had gathered. Bauer, a patrolman with over six years of experience, spotted Damato on I–80 between Laramie and Cheyenne and began following him. Using his radar, Bauer ascertained that Damato was driving 77 miles per hour (in a 75 mph zone) as he passed a vehicle. Bauer had not yet turned on his lights to stop Damato when Bauer perceived that Damato saw him and slowed down and moved into the right-hand lane without using a signal light, also a violation of the regulations of traffic on highways. Bauer then stopped Damato as Rettinger had done earlier that day. It is of importance to our decision that all that occurred in the ensuing 50–60 minutes is on audio/video tape, so that while we rely on Trooper Bauer's testimony, we can also judge his testimony against the audio/video record of it.

[¶ 35] Bauer assigned some significance to the fact that Damato pulled over near a bridge, which is an unsafe spot for such

stops. It was Bauer's experience that some persons do such a thing because they think it will reduce the likelihood of the Trooper spending as much time on the stop because of safety concerns. Bauer gave Damato his "general spiel" about why he was stopping him and asked for his license and registration. Damato initially said the registration was in the trunk, but then quickly corrected himself to say glove box. Bauer made a note of that because "to me that's a subconscious statement." Of course, at this point Bauer knew that Damato did not want his trunk searched because he refused to let Rettinger do it, so it can fairly be inferred that Bauer might well treat that as a subconscious statement given all the information available to him. Bauer also noted that Damato had red/pinkish eyes, what he considered "dope eyes," and he had a bottle of visine on the console. Bauer indicated that his experience suggested that the color of Damato's eyes looked more like those of someone who had been smoking marijuana than those of someone who had been drinking. He also noted the luggage in the back seat and the food wrappers—things that suggested Damato was making a "hard run." Bauer also perceived that Damato was "evasive," "didn't want to look at me," was "extremely nervous," and had "beading on his forehead."

[¶ 36] Damato had questioned that he was speeding, so Bauer wanted to show him the radar, as well as check him for marijuana intoxication. As he was walking with Damato to the patrol car, Bauer said he needed to pat him down, that that was a standard safety/self-preservation practice before letting someone inside the patrol vehicle. Indeed, Bauer related an incident from his personal experience where he was almost killed by a person he had stopped in 1995. Bauer found two small pocket knives in Damato's front pockets, and felt what he thought was a packet of marijuana in his back pocket. Bauer testified that his experience and training suggested to him that the object in Damato's back pocket probably was marijuana. He asked Damato what it was, and he said he did not know but "fiddled around in there for a little bit" but eventually Damato pulled out a piece of cellophane with marijuana in it.

Bauer then placed Damato under arrest for marijuana possession.

[¶ 37] Next, Bauer placed Damato in the front seat of his patrol car and read him the *Miranda* warnings. Damato agreed to talk with Bauer. Bauer told Damato that honesty was the best policy, and Bauer could tell that Damato was very nervous. Damato said there was nothing in the trunk of his car (by this time Bauer had requested a sniffer dog to come to the scene), but Bauer persisted in his questioning, suggesting to Damato that his body language was telling something else. Damato eventually said that it was "a trunkful of weed." Bauer opened the trunk of the car and discovered that it was packed solid with what turned out to be more than 300 pounds of marijuana (leaving no room for luggage in the trunk). Bauer also testified that he told Damato that he was going to be arrested for marijuana possession and, incidental to that arrest and the impoundment of his vehicle, the contents of the car would have been inventoried. Within less than an hour from the initial stop, the sniffer dog, agents from the Division of Criminal Investigation, and a tow truck had arrived at the scene, and the investigation was moved into Cheyenne for further processing.

[¶ 38] The district court initially made a determination that the evidence against Damato should be suppressed. However, upon motion of the State, the district court agreed to rehear the matter and, after taking additional testimony, it reversed its decision and denied the motion to suppress, largely on the basis that Trooper Bauer had called for a sniffer dog, the sniffer dog did arrive on the scene in a timely manner, and the marijuana most certainly would have been discovered at that time, even though Bauer had opened the trunk and found it earlier.

[¶ 39] The testimony at the rehearing of the motion to suppress augments the record we must review in this case. Special Agent Jimmy Siler of the Wyoming Division of Criminal Investigation was called as a witness and related that, from his experience and training, he had come to know that the Southwest and Southern California regions of the country are the principal sources and/or conduits of the narcotics, and more specifical-

ly marijuana, which are transported through Wyoming to markets in the Midwest.

[¶ 40] State Trooper Charles Caruthers, a 22–year veteran of the Highway Patrol, was called as a witness, and he testified that he was summoned to assist Trooper Bauer at the scene of Damato's arrest. He helped move Damato's car, as well as the patrol cars, across the bridge and out of harm's way. He also related that the trunk of Damato's car was closed at the time the sniffer dog arrived on the scene.

[¶ 41] Cheyenne Police Officer Lyle Finch, who was off duty and lives about 11 miles from the crime scene, testified that he was called at 10:30 a.m. to report to the scene, along with his dog, Carlos, to participate in the investigation. Finch was asleep when he received the call, and it took some time for him to prepare himself and Carlos to go out on duty. He related the details of his training and experience, as well as that of Carlos. Bauer stopped Damato at about 10:27 a.m., and Finch was not able to leave for the crime scene until about 11:00 a.m. He arrived at the scene at 11:11 a.m. Finch then employed Carlos in his assigned task, according to the established protocol, and Carlos indicated that there were narcotics in the trunk of Damato's car.

[¶ 42] The majority concludes that Damato was "commanded to exit his car" and the "pat down" search violated the Fourth Amendment because Bauer had no objectively based suspicion that Damato was armed and dangerous. I disagree with that characterization of the facts on several points. First, I cannot agree that Damato was "commanded to exit his car." Bauer's testimony was that he asked Damato to come back to his car and see the radar readout of his speed, and that is consistent with the audio/video tape. While Bauer may have been persistent in that regard, as well he should have been, Damato went with him voluntarily—most certainly he was not "commanded." As a safety precaution, Bauer did a "pat down" on Damato before he allowed him into the patrol car. The videotape reveals that Bauer was extremely polite and not especially insistent about the pat down and that Damato was cooperative both with the pat

down, as well as with all else that followed. Bauer was within the bounds of the Fourth Amendment in using the pat down to uncover weapons (of which there were two), as well as contraband (marijuana). *See Minnesota v. Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 2136–39, 124 L.Ed.2d 334 (1993); and Kate Donovan Reynaga, Annotation, *Application of "Plain–Feel" Exception to Warrant Requirements—State Cases,* 50 A.L.R.5th 581 (1997 and Supp.2001).

[¶ 43] I also part company with the majority with respect to Bauer's "articulable suspicion." In reaching this conclusion, I rely on some of the same cases cited by the majority, but I am also persuaded that a comprehensive review of the most soundly reasoned and the most directly pertinent cases counsels the opposite result, under all the facts and circumstances of this case. Thomas Fusco, Annotation, *Permissibility Under Fourth Amendment of Detention of Motorist by Police, Following Lawful Stop for Traffic Offense, to Investigate Matters not Related to Offense,* 118 A.L.R.Fed. 567 (1994 and Supp. 2001). When the information gathered by Rettinger is combined with the information gathered by Bauer, the "articulable suspicion" cases mandate a conclusion that the state troopers acted responsibly, within the limits erected by the Fourth Amendment (as well as the Wyoming Constitution), and in conformance with the duties they are required to carry out daily on our state's highways. In so concluding, I find it unnecessary to further characterize or attempt to parse what the state troopers related in their testimony. I have attempted to set out what is in the transcripts accurately and completely. I am satisfied that, based upon their experience and training, what they observed constituted "articulable suspicion."

[¶ 44] Finally, the majority shrugs off the concept of "inevitable discovery" far too hastily. I, of course, do not think we need to reach that harbor. However, even if I were convinced that Trooper Bauer's actions (in patting down Damato and opening the trunk of the car) transgressed the Fourth Amendment, then I can readily accept that the sniffer dog would have inevitably discovered the damning evidence, and Damato would be

in the same hot water. The sniffer dog arrived in less than an hour, and the detention of Damato does not meaningfully exceed the line we drew in *Welch*. Martin J. McMahon, Annotation, *What Circumstances Fall Within "Inevitable Discovery" Exception to Rule Precluding Admission, in Criminal Case, of Evidence Obtained in Violation of Federal Constitution*, 81 A.L.R.Fed. 331 (1987 and Supp.2001).

[¶ 45] I would affirm the suppression order and remand for execution of the sentence imposed by the district court.