2004 WY 130

**Glen Eric RICE, Appellant (Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

**No. 03–116.**

Supreme Court of Wyoming.

Nov. 3, 2004.

Rehearing Denied Nov. 30, 2004.

Representing Appellant: Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Ryan R. Roden, Senior Assistant Appellate Counsel. Argument by Mr. Roden.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Daniel M. Fetsco, Assistant Attorney General. Argument by Mr. Fetsco.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

HILL, Chief Justice.

[¶ 1] Appellant, Glen E. Rice (Rice), entered a conditional plea of guilty to the crime of possession of marijuana with intent to deliver, thereby preserving his right to appeal the district court's denial of his motion to suppress the evidence against him. The police initially contacted Rice when he was found sleeping in his automobile at a convenience store/gas station in Gillette. During the course of the ensuing events, the police employed a drug detection dog that was already at the scene, to "sniff" the exterior of Rice's car. Rice made incriminating statements in response to questions posed to him by the police officer and Rice also voluntarily produced a tin of marijuana he had on his person. Rice was arrested at the scene for possession of marijuana. A later search of Rice's car revealed about 70 pounds of marijuana packed in luggage located in the trunk of the car. We will affirm.

## ISSUES

[¶ 2] Rice raises this issue:

Whether [Rice] was illegally seized and therefore the trial court erred in denying [his] motion to suppress evidence and statements.

The State contends that the district court properly denied Rice's motion to suppress.

## FACTS AND PROCEEDINGS

[¶ 3]   Rice was asleep in his automobile, in the parking lot of a convenience store, in Gillette, Wyoming, when he was first contacted by the Gillette Police Department at about 10:00 p.m. on November 27, 2002. The police were checking on Rice because the parking lot had signage that indicated the parking was for customers only. The police had not received a complaint from the owner that night but had received frequent complaints in the past. On the scene was Gillette Police Officer Greg Brothers. According to Officer Brothers, he awakened Rice and questioned him. Officer Brothers checked Rice's Illinois driver's license, and there were no "wants or warrants," so it was returned to him and he was told that he was free to leave. In his testimony, Rice related that his driver's license was not returned to him until a week after he was released from jail on bond, and he was not told that he was free to go. As events further transpired, after Officer Brothers allowed Rice the freedom to leave in his car, and upon Officer Brothers' request, Rice agreed to answer some additional questions. During the course of that exchange, Rice eventually admitted there might be a "joint" in his car that had been left there by "friends." Officer Brothers first asked Rice if he could search the car and Rice refused. Officer Brothers then asked Rice for his consent to have his narcotics dog examine the exterior of his car. Rice at first declined to consent but when asked a second time, Officer Brothers testified that Rice consented. Rice testified that he did not consent. The dog alerted to at least two areas of the car, the trunk and the open driver's side front door. Rice then admitted he had a Carmex tin containing marijuana in his pants pocket and voluntarily produced it for Officer Brothers. Rice was arrested and taken to jail. Rice's car was searched, including the trunk of the car. The car was then taken to the Gillette Police Department, and the following day the police obtained a search warrant to further examine the contents of the car. The police were able to describe with great accuracy the things to be searched for because the contents of the car had already been examined.

[¶ 4]   The more refined details pertinent to the motion to suppress will be set out in our discussion.

[¶ 5]   In a felony information filed in the district court on December 11, 2002, Rice was charged with possession of marijuana with intent to deliver.[1] On January 8, 2003, Rice filed a motion to suppress the evidence found in his car and on his person, as well as the statements he made to the police. After a hearing, the district court denied the motion to suppress.

[¶ 6]   On February 24, 2003, judgment was entered on Rice's conditional plea of guilty. The plea was conditioned upon recognition of his right to appeal the district court's denial of his motion to suppress. Rice was sentenced to serve a term of five to eight years in a state penal institution.

## STANDARD OF REVIEW

[¶ 7]   We apply these standards to our evaluation of the district court's decision to deny the motion to suppress:

---

1.   § 35–7–1031. **Unlawful manufacture or delivery; counterfeit substance; unlawful possession.**
   (a) Except as authorized by this act, it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance. Any person who violates this subsection with respect to:
      (i) Methamphetamine or a controlled substance classified in Schedule I or II which is a narcotic drug, is guilty of a crime and upon conviction may be imprisoned for not more than twenty (20) years, or fined not more than twenty-five thousand dollars ($25,000.00), or both;
      (ii) Any other controlled substance classified in Schedule I, II or III, is guilty of a crime and upon conviction may be imprisoned for not more than ten (10) years, fined not more than ten thousand dollars ($10,000.00), or both;
      (iii) A substance classified in Schedule IV, is guilty of a crime and upon conviction may be imprisoned for not more than two (2) years, fined not more than two thousand five hundred dollars ($2,500.00), or both;
      (iv) A substance classified in Schedule V, is guilty of a crime and upon conviction may be imprisoned for not more than one (1) year, fined not more than one thousand dollars ($1,000.00), or both.
   Wyo.Stat.Ann. § 35–7–1031(a) (LexisNexis 2003).

A trial court's ruling on a defendant's motion to suppress a statement on the grounds that it was made involuntarily is reviewed de novo. In conducting such a review, we defer to the trial court's findings of fact unless those findings are clearly erroneous. This Court considers all the evidence in the light most favorable to the trial court's determination because the trial court has the opportunity to hear the evidence and to assess the credibility of witnesses. The Fifth and Fourteenth Amendments to the United States Constitution, and Wyoming Constitution Article 1, §§ 6 and 11, require that confessions be voluntary. A statement that is obtained by coercion is not trustworthy and may not be used at trial against the person who made it. A defendant is deprived of the right to due process of law if an involuntary statement is admitted at his trial. A statement is considered to be voluntary if the defendant makes it of his own free and deliberate choice, and not because of intimidation, coercion or deception. The prosecution has the burden to prove, by a preponderance of the evidence, that a defendant's statement is voluntary. *Lara v. State,* 2001 WY 53, ¶ 9, 25 P.3d 507, ¶ 9 (Wyo.2001); *also see Hadden v. State,* 2002 WY 41,¶ 17, 42 P.3d 495, ¶ 17 (Wyo. 2002); and *Meek v. State,* 2002 WY 1, ¶ 13, 37 P.3d 1279, ¶ 13 (Wyo.2002).

*Goulart v. State,* 2003 WY 108, ¶ 6, 76 P.3d 1230 ¶ 6 (Wyo.2003).

When we review a district court's ruling on a motion to suppress evidence, we do not interfere with the findings of fact unless they are clearly erroneous. When the district court has not made specific findings of fact, we will uphold its general ruling if the ruling is supportable by any reasonable view of the evidence. We consider the evidence in the light most favorable to the district court's ruling because of the district court's ability to assess "the credibility of the witnesses, weigh the evidence, and make the necessary inferences, deductions, and conclusions" at the hearing on the motion. The constitutionality of a particular search or seizure is, however, a question of law which we review de novo. *Meek v. State,* 2002 WY 1, ¶ 8, 37 P.3d 1279, ¶ 8 (Wyo.2002) (supporting citations omitted).

*Innis v. State,* 2003 WY 66, ¶ 13, 69 P.3d 413, ¶ 13 (Wyo.2003).

"The investigatory stop represents a seizure which invokes Fourth Amendment safeguards, but, by its less intrusive character, requires only the presence of specific and articulable facts and rational inferences which give rise to a reasonable suspicion that a person has committed or may be committing a crime." *Wilson,* 874 P.2d at 220 (citing *Lopez v. State,* 643 P.2d 682, 683 [ (Wyo. 1982) ]; *see also Putnam [v. State],* 995 P.2d [632] at 637 [ (Wyo.2000) ]); and *McChesney v. State,* 988 P.2d 1071, 1074 (Wyo.1999). We have a dual inquiry for evaluating the reasonableness of an investigatory stop: (1) whether the officer's actions were justified at the inception; and (2) whether it was reasonably related in scope to the circumstances that justified the interference in the first instance. *Wilson,* 874 P.2d at 223 (quoting *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879, 20 L.Ed.2d 889); *see also United States v. Hensley,* 469 U.S. 221, 228, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985). An officer's conduct is judged by an objective standard which takes into account the totality of the circumstances. *Putnam,* 995 P.2d at 637; *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1879–81; *United States v. Lang,* 81 F.3d 955, 965 (10th Cir.1996).

*Martindale v. State,* 2001 WY 52, ¶ 11, 24 P.3d 1138, ¶ 11 (2001). In applying this test, the Court has "consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry." *Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996). "The government has the burden of demonstrating that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *United States v. Perdue,* 8 F.3d 1455, 1462 (10th Cir.1993) (quotation marks omitted).

*Damato v. State,* 2003 WY 13, ¶ 9, 64 P.3d 700, 704–5, ¶ 9 (Wyo.2003); *also see Fender v. State,* 2003 WY 96, ¶¶ 9–14, 74 P.3d 1220, ¶¶ 9–14 (Wyo.2003).

### DISCUSSION

[¶ 8] At the hearing on the motion to suppress, Officer Brothers testified that at 10:00 p.m., on November 27, 2002, he was patrolling the lot of a convenience store/gas station to ensure that there was no one loitering there. The store was in the process of closing. That store had made numerous complaints of people loitering in its parking lot, and sometimes the police went in there as a preventative measure. Officer Brothers explained that when people loiter in the lot, there is not room for customers to come in and park. Although there was one other unoccupied vehicle in that area of the lot, Officer Brothers took special note of a white Buick on the north side of the store because it appeared that the driver's seat was reclined. The car had Illinois plates, and a check through dispatch revealed that the car belonged to Glen Rice. The car was validly licensed and registered.

[¶ 9] Officer Brothers decided to contact the occupant of the vehicle to check on his well-being and to tell him that he had to move his car from the parking lot. Officer Brothers walked up to the window and knocked on it to make contact with the occupant of the car, who was sleeping in the reclined driver's seat. The occupant, who turned out to be Rice, appeared to awaken and look at Officer Brothers but then "laid back down and acted like he was sleeping again." Officer Brothers rapped on the window again, and this time Rice "picked up his cell phone and acted like he was talking on his cell phone and pointed to the passenger seat." Rice still did not appear to notice Officer Brothers, so he knocked on the window again. On that third attempt, Rice awakened and noticed Officer Brothers. Rice opened his car door, got out of his car (not at the police officer's request), and began to speak with Officer Brothers. Rice smoked a cigarette while they talked.

[¶ 10] Officer Brothers asked Rice if everything was okay and informed him that he could not sleep in the store parking lot nor could he be in the parking lot if he was not a customer. Rice told Officer Brothers that he was just traveling through and stopped to rest. Officer Brothers asked Rice for identification, and Rice asked Officer Brothers about motels in the area. Rice gave Officer Brothers his Illinois driver's license and an Illinois State ID card. Officer Brothers then had some casual conversation with Rice and he related, after "a bit of a pause," that he was coming from Seattle and was headed to Rapid City. In response to Rice's inquiry, Officer Brothers told Rice it was about a three-hour drive to Rapid City and that he should take a break before he headed out on the road. Rice did not appear to be nervous. Dispatch had checked on Rice's driver's license and determined that there were no warrants or other problems, so Officer Brothers returned the license and the ID card to Rice and testified that at that point he told Rice he was free to go. Officer Brothers also gave Rice directions to some local motels.

[¶ 11] Officer Brothers turned to walk away but then, after a pause of several seconds (maybe 30 seconds), he turned back and asked Rice if he could ask him some additional questions. Rice indicated that he did not object to answering more questions. By this time Gillette Police Officer Ben Gauthier was also on the scene. Neither police vehicle was blocking Rice's egress from the parking lot, and neither police officer had activated the emergency lights on his patrol car. Officer Brothers waited until after Rice was informed that he was free to go before asking additional questions because "[f]rom my training and understanding that is the proper procedure, that we cannot detain anyone against their will." In his mind, Officer Brothers thought that Rice was aware that he did not have to answer any further questions and that he was free to leave had he chosen to do so.

[¶ 12] Officer Brothers asked Rice if there were any drugs or controlled substances in his vehicle. Officer Brothers related that Rice "didn't respond to me, just got a blank look and then stepped up against the side of his vehicle and placed his head

probably within a foot of the side glass of the vehicle and just stared into the vehicle." Officer Bothers then repeated his question and again Rice did not respond. Officer Brothers further testified that "[Rice] eventually looked back up at me and asked me what the question had been. I repeated the question and received the same response. He again placed his face rather close to the window of the vehicle and acted as if he was looking through the vehicle and didn't respond to me." That happened a couple of times, and then Officer Brothers finally asked Rice if he was okay. Rice responded that "he didn't know what I was looking for." When Officer Brothers iterated that he was checking to see if there were any controlled substances in the vehicle, Rice said a friend might have left a joint in the vehicle. Officer Brothers testified that at this point Rice was still free to leave.

[¶ 13] Officer Brothers asked Rice if he could look in the vehicle, and Rice said he would rather he did not. Officer Brothers then asked Rice if he could run his narcotics dog around the exterior of the vehicle, and Rice consented. Officer Brothers testified that Rice was still free to leave and that he would have allowed him to leave if Rice had wanted to. Officer Brothers retrieved his dog from his car and proceeded to take the dog around the car on a lead (he did not want the dog running free because they were near two busy streets). The dog alerted to the trunk of the vehicle first. As the sniffing process continued, the dog came to the open driver's side door (that Rice had opened and left open during this contact), and the dog alerted to the interior of the car. Officer Brothers testified that in his mind, Rice was still free to leave at that point and that he had not allowed the dog to enter the interior of the car because Rice had not consented to that.

[¶ 14] At that point, Officer Brothers informed Rice that he thought there were drugs in the car and asked him where they were. Rice indicated that he thought the dog had not found anything, but Officer Brothers said that the dog had. Rice then repeated that there might be a joint in his car left there by a friend. Officer Brothers

asked if he knew where it was. Rice initially responded that it was not in his best interests to answer the question. When Officer Brothers repeated his question, Rice told him he had a joint in his pocket. He reached into his pocket and brought out a Carmex™ container. Rice opened the lid and revealed a green leafy substance that looked and smelled like marijuana. Officer Brothers also asked if Rice had any weapons, and Rice said he had a knife and started to reach for it. Officer Brothers stopped him, out of concern for his personal safety, and handcuffed Rice and placed him under arrest for possession of a controlled substance.

[¶ 15] After placing Rice under arrest, he conducted a pat down search of his person and retrieved a "stiletto-type knife that is activated by pushing the blade, is spring loaded and shoots open." As the search continued, Officer Brothers placed all the items found in the search of Rice's person on the driver's seat in Rice's car. When Officer Brothers leaned into the car while placing the search items on the driver's seat, he detected a strong odor of fresh marijuana. Rice was placed in Officer Gauthier's car and transported to jail. About 10–15 minutes transpired from the time Officer Brothers first contacted Rice until the time that he was arrested.

[¶ 16] A second backup police officer, Sergeant Mark Ziska, then arrived on the scene. Ziska was Officer Brothers's supervisor, and Officer Brothers informed Ziska of what he intended to do next. Photographs were taken of Rice's vehicle and the crime scene. Officer Brothers brought out his canine again and had him search the interior of the vehicle. The dog alerted to a suitcase that was located on the passenger seat of Rice's car. Brothers found marijuana in that suitcase. The dog was then removed from the car (this is part of the search procedure), and the search was resumed anew. The dog alerted to drugs in the backseat as well, stuffing his nose deep into the seam where the seat and backrest meet. Officer Brothers found nothing in the backseat, so he used the keys he had to Rice's car to open the trunk. In the trunk Officer Brothers found

several pieces of luggage that were stuffed full of plastic bags of marijuana.

[¶ 17] At this point, Officer Brothers called Detective Steve Wageman to the scene. Wageman determined that Rice's car should be driven to the police department sally port, and Officer Brothers was directed to go to the county attorney's office to begin the process of getting a search warrant for the purpose of further searching the automobile. A warrant was obtained and the luggage from the trunk was searched, revealing about 70 pounds of marijuana. Additional photographs were also taken.

[¶ 18] Officer Gauthier testified that he arrived on the scene as Officer Brothers was returning the driver's license to Rice and telling him he was free to go. Gauthier participated in much of the "consensual" conversation between him, Rice, and Officer Brothers. Gauthier observed Rice retrieve the Carmex™ container from his pocket and give it to Officer Brothers. He also observed the arrest.

[¶ 19] Rice testified also. Rice claimed he had been parked at the store for about 10 minutes when a uniformed police officer awakened him as he was trying to "catch my thoughts". He wanted to clear his head and ready himself to get some sleep. When he heard the knock at the window of his car, he awakened and got out of the car. Shortly after he was contacted by the police officer, his watch alarm went off (he had set it to go off in ten minutes, which was 10:00 p.m.). The police officer asked for his ID, a request that Rice did not believe he could refuse. Continuing, Rice testified that he gave his driver's license, state ID card, and insurance card to the officer and they were never returned to him nor was he told that he was free to leave. Rice related that the interrogation was not interrupted by a pause, as Officer Brothers claimed, and that he did not consent to the search of the exterior of his car by the canine. Rice conceded that the police officers asked about his welfare, that the conversation was cordial, and that they gave him directions to a motel. He conceded that he was not threatened in any way and that he had not been formally arrested when he gave up his Carmex™ container with the

marijuana in it. Rice did relate that the second question he was asked (after "are you okay") was if he was using methamphetamine and if he had marijuana in his car. Rice estimated the encounter lasted "ten to 30 minutes."

[¶ 20] After hearing all of the offered evidence and the arguments from counsel, the district court took the matter under advisement and issued a decision letter. In its decision letter, the district court found that Officer Brothers returned Rice's driver's license and ID card to him and told him he was free to go. The district court resolved other conflicts in the facts in favor of the State as well, finding that the police officers were the more credible witnesses and that Rice consented to the initial canine sniff of the exterior of his car. When Rice was confronted with the results of the canine sniff, he voluntarily produced a container with marijuana in it and was arrested for possession of marijuana. The district court's brief decision letter articulated this reasoning:

[Rice] argues first that Officer Brothers has no right to ask [Rice] for identification given the circumstances of the case and as set forth in *United States v. McSwain*, 29 F.3d 558 (10th Cir.1994). While this Court believes that *McSwain* is distinguishable in that the officers here had had 95 calls about loitering in the Kwik Stop parking lot, assuming *arguendo* that *McSwain* applies, here the purpose for the *McSwain* rule vanished once the officer returned [Rice's] driver's license and told him that he was free to go.

[Rice] next argues that the methodology undertaken here by the police was little more than a trained ruse, that ruse being that once an officer tells someone that they are free to go there is an immediate, wrongful and coercive request for permission to search for some other information which may lead to the discovery of contraband. Rather, the Court finds that the nature of the Officer's inquiry here was in accordance with the holding in *United States v. Guzman*, 864 F.2d 1512 (10th Cir.1988).

Finally, the Court has reviewed this case in the context of the holding in *Damato v. State*, 2003 WY 13, 64 P.3d 700, and finds that the factual situation of the case at bar is distinguishable. Once again, in the present case, the evidence is that the Officer concluded his business with [Rice], returned [his] driver's license and, at that point, [Rice] was free to go. Unlike *Damato*, no pat-down of defendant was conducted and, in fact, the testimony was that during the initial encounter the Officer never touched [Rice]. Moreover, [Rice] here produced the lip balm canister for the Officer after Duke [the canine] walked around the exterior of [Rice's] Buick and alerted at several locations.

[¶ 21] Rice contends that: (1) The initial investigatory stop was invalid; (2) the scope and duration of the investigatory stop exceeded Officer Brothers' justifications for detaining Rice; (3) Officer Brothers had no reasonable suspicion to retain Rice's identification cards and run a criminal background check, detaining him the entire time; and (4) even if this Court finds his identification was returned to him and Rice was informed he was free to go, the investigatory stop continued, and Rice was detained the entire time until he was arrested. Because his detention was illegal, Rice continues, the statements Rice made and the marijuana seized must be suppressed as "fruits of the poisonous tree."

[¶ 22] Rice acknowledges that our review here is limited to a consideration of the Federal Constitution's Fourth Amendment because no analysis based on Wyoming's parallel constitutional provision was offered below (nor was it offered in Rice's appellate brief). *See Damato*, ¶¶ 8 and 11. Rice also concedes this case does not involve a traditional "traffic stop," but he does characterize it as an "investigatory stop." The State's argument is also premised on the assumption that this was an "investigatory stop," and the district court's reasoning also appears to have adopted that stance. *See Eckenrod v. State*, 2003 WY 51, ¶ 13, 67 P.3d 635, 639–40, ¶ 13 (Wyo.2003).[2]

[¶ 23] In essence, Rice challenges the authority/reasonableness of the police "contacting" him at all, as he lay sleeping in his automobile in a convenience store parking lot. Failing that, Rice contends that if the "contact"/investigatory stop is deemed reasonable, that its scope was unreasonable. The police had no "suspicions" about Rice, beyond requiring him not to park in the parking lot, and to move on if his condition permitted (hence, the inquiry as to whether he was okay). Under the standard of review we have identified above, it is incumbent on this Court to evaluate the reasonableness of the investigatory stop and whether it was reasonably related in scope and time to the circumstances that justified the interference in the first instance. Of course, an individual's valid consent to search, as well as purely voluntary admissions, obviates the requirement of "suspicion" or probable cause. Rice contends that he did not consent, but the district court, in the process of weighing the credibility of the witnesses (Rice and the police officers), determined that the police officers were more credible.

[¶ 24] The State contends that it has an "obvious" interest in preventing motorists from sleeping in their cars in convenience store parking lots. Thus, the limited intrusion into Rice's protected rights was reasonable. The police officer articulated the purposes of his contact with Rice to be to inquire about his well-being and tell him to move along if, in fact, he was all right. We agree that the police officer's initial contact with Rice was reasonable under these circumstances. Continuing, the State also contends that Rice voluntarily got out of his car (leaving the driver's side car door open) and engaged in a conversation with the police directed to ascertaining Rice's well-being and to get him to move along, in particular to a motel to get some rest. Rice concurred with the characterization of his contact with the police as cordial. Since the entire encounter, from start to Rice's arrest, lasted only 10 to 15 minutes, the initial discussion could only have been a few minutes. We conclude that

---

2. We accept the parties' and the district court's concessions that this incident was an "investigatory stop." However, we will conclude that closer analysis reveals it to be a "consensual" or "voluntary" encounter.

the scope and duration of the police officers' initial contact with Rice was also reasonable. The evidence presented at the suppression hearing supports the district court's conclusion that at the end of that reasonable period of detention, Rice's driver's license and other papers were returned to him, and he was informed that he was free to go.

[¶ 25] This case falls into a discrete category of cases that involve a police officer merely walking up to a person seated in an automobile in a public place and directing a question to the occupant. The general rule is that this alone does not constitute a seizure and, thus, does not invoke Fourth Amendment protection. 4 Wayne R. La-Fave, *Search and Seizure*, § 9.3(a), at 97–98 (fn.45) (1996 3d ed. and 2004 Pocket Part at 36–37). That footnote collects many cases that are directly in point for the instant case. These cases turn on their individual factual circumstances, and the factual circumstances of this case place it well within the general rule. *See, e.g., People v. Paynter*, 955 P.2d 68, 71–76 (Colo.1998) (police stopping to inquire of occupants of parked car is a consensual encounter; request for identification without more does not convert consensual encounter into seizure that invokes protection of Fourth Amendment; analysis requires consideration of totality of circumstances); and *State v. Reason*, 263 Kan. 405, 951 P.2d 538, 540–45 (1997) (police contact with two individuals asleep in a parked car in a public park was voluntary encounter; any investigatory detention ended when police informed defendant he was free to go; consent to search vehicle was voluntary). Rice cites several cases that are only tangentially in point. Those cases are not persuasive here (which the district court found as well) where the critical factor is Rice's consent to a search of the exterior of his car, as well as the voluntary production of a controlled substance that was in his possession. These

factors justified his arrest and the subsequent searches of his automobile.[3]

[¶ 26] The district court found, and the record supports the finding, that when Officer Brother's asked Rice to consent to talk with him further, he tacitly agreed to do so by freely answering the officer's questions. That further discussion eventuated in an admission by Rice that there might be a "joint" in his car and a request by Officer Brothers to search Rice's car. Rice did not consent to a search of his car by Officer Brothers, but the district court's finding that Rice did consent to allow Officer Brothers to have his drug detection canine sniff around his car is not clearly erroneous and is supported by the evidence presented at the suppression hearing. The district court's finding that Rice's subsequent admission that he possessed marijuana, accompanied as it was by a voluntary production of evidence of that possession to Officer Brothers, is not clearly erroneous either.

**CONCLUSION**

[¶ 27] We have carefully examined the record in this case in the light of the applicable standards of review. We conclude that the district court's factual findings are not clearly erroneous and that the district court's denial of the motion to suppress is not contrary to the applicable legal principles.

3. We have had several occasions to rule on searches similar to the one at issue in this case. None of those cases is directly pertinent to the resolution of this matter, but we mention them here so as to refer our readers to other cases related to, and fleshing out, this issue: *State v. Williams*, 2004 WY 53, 90 P.3d 85 (Wyo.2004) (no separate finding of exigency required where there is probable cause for search based on dog's alert to presence of narcotics); *Campbell v. State*, 2004 WY 106, 97 P.3d 781 (Wyo.2004) (prolonged detention resulted in Fourth Amendment violation); *Barch v. State*, 2004 WY 79, 92 P.3d 828 (Wyo.2004) (excessive detention invalidated search); *Morgan v. State*, 2004 WY 95, 95 P.3d 802 (Wyo.2004) (dog sniff not search under Fourth Amendment).