2009 WY 18

**Joseph Michael SHAW, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. S–08–0055.**

Supreme Court of Wyoming.

Feb. 12, 2009.

Representing Appellant: Diane M. Lozano, Wyoming State Public Defender; Tina N. Kerin, Appellate Counsel; and Eric M. Alden, Senior Assistant Appellate Counsel. Argument by Mr. Alden.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Leda M. Pojman, Assistant Attorney General. Argument by Ms. Pojman.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

HILL, Justice.

[¶ 1] Appellant, Joseph Michael Shaw (Shaw), entered a conditional plea of guilty to felony possession of marijuana. The condition was that he be given leave to appeal the district court's denial of his motion to sup-

press the evidence seized from his car by a Wyoming State Trooper. We will affirm.

## ISSUE

[¶ 2] Shaw raises this issue:

Was the detention of [Shaw], and the entry into the vehicle, illegal, and should his motion to suppress have been granted?

In response the State queries:

Were [Shaw's] constitutional rights under the Fourth Amendment to the United States Constitution violated, and did the district court err in denying his motion to suppress?

## FACTS AND PROCEEDINGS

[¶ 3] On December 25, 2006, at approximately 8:30 a.m., Wyoming Highway Patrol Trooper Beatriz Schulmeister, as part of her routine duties, was patrolling the Wagonhound Rest Area for motorists that might need assistance. That rest area is located approximately 40 miles west of Laramie and 60 miles east Rawlins on Interstate 80 in Carbon County. The rest stop was a common place for motorists to become stuck during the winter months, especially when the roads were snow-packed and icy. Because it was Christmas Day, and because the roads were a hazard for both motorists as well as the trooper—due to the packed snow, ice, and blowing and drifting snow—the trooper was not engaging in speed enforcement.

[¶ 4] In her role providing assistance, the trooper noticed a Honda Accord stuck in the middle of the semi-truck parking lot in a snow drift. The trooper radioed dispatch with the license plate number of the vehicle. With the intention of helping Shaw, the driver and sole occupant of the vehicle, Trooper Schulmeister parked her patrol car slightly in front of the stuck vehicle at an angle. The trooper's video and audio recorder were in operation, and thus much of her interaction with Shaw can be seen and/or heard (the audio is available only when both Shaw and the trooper were in her vehicle). It is evident that the recordings were not of the highest quality but persistence in listening does tend to support the district court's ulti-

mate findings. Shaw and the trooper simultaneously exited their vehicles and they met between the two cars.

[¶ 5] Troopers are not required to pull stuck motorists out of the snow and do not typically do so without a release from the motorist. As an alternative, and to avoid liability, troopers will call a wrecker, which is very expensive, to tow the vehicle or to provide other assistance to the motorist.

[¶ 6] Trooper Schulmeister asked Shaw if he needed help, and he responded that he did, noting that he had been stuck in the snow since 4:00 a.m. that morning. The trooper offered to pull out the Honda with a tow strap because it only needed to be moved a short distance. However, Shaw instead declined and asked the trooper if he could borrow a shovel. Because of the officer safety concerns involved when a law enforcement officer provides a citizen with an object that could be used as a weapon against the officer, and because the trooper was required by Wyoming Highway Patrol policy to fill out a form relating to her contact with, and the assistance that she provided to Shaw, she asked him for his driver's license, insurance, and registration. In response, Shaw asked the trooper if she was "kidding." She told Shaw that she was not kidding and again asked him for the information, to which he responded, "Are you kidding, it's Christmas, let's just go home." Finally, after she again told Shaw she was serious about her request, he confessed he did not have a driver's license.

[¶ 7] Shaw's reaction to the trooper's offer of assistance caused her to become concerned for her safety, as citizens typically do not react the way Shaw had reacted when law enforcement attempts to help them. Thus, because he was making her nervous, the trooper created distance between Shaw and herself. She asked Shaw if he had any weapons. The videotape reveals that Shaw became somewhat agitated at this point and his movements became overly boisterous and odd. That is, Shaw began stepping back and forth, as well as to the left and to the right, and turned and walked toward the Honda. Shaw also started to put his hands into his coat pockets on several occasions and would

partially remove his coat and then immediately put it back on. At one point, Shaw asked the trooper if he could put his coat into his car, despite the fact that he was standing outside on a freezing December morning. Shaw literally begged the Trooper—folding his hands in front of him, and making a slight rocking motion—to let him get into his vehicle so he could leave. Shaw, of course, could not leave, as he was stuck in the snow. Finally, Shaw would not respond to the trooper's question as to why he was driving without a driver's license. It was at this point that the trooper patted Shaw down for weapons and placed him into the back of her patrol car which, of course, was a safer and more comfortable place to continue their conversation regarding issuing Shaw a citation for driving under suspension, as well as to make arrangements to have his car towed.

[¶ 8] While in the patrol car, the trooper asked Shaw for his name, address, social security number, date of birth, height, eye color and hair color, where he was born, and where he was traveling from, and where he was traveling to. Shaw told the trooper his license was suspended for driving under the influence and that he had a "couple of warrants." Dispatch confirmed that Shaw had a suspended license as a result of both driving under the influence as well as having no insurance, that he was not the owner of the car, and that he had outstanding warrants out of Lander.

[¶ 9] During this time, because Shaw was still acting very nervous, squirming around in the back of the patrol car, and talking fast, the trooper asked him to calm down. However, even after Trooper Schulmeister told Shaw that she could not enforce the warrants out of the City of Lander and that she was not going to arrest him (which he thought was "awesome"), Shaw still acted nervous and stated that he was going to throw up. After the trooper allowed him to roll down his window to throw up, he stated he was just being sarcastic.

[¶ 10] Because Shaw legally could not drive the vehicle, due to the fact that he had a suspended driver's license, the trooper contacted dispatch and requested a wrecker to impound the vehicle. The trooper also told Shaw that the wrecker driver would take him to Laramie, where he could call a friend or take a bus to his next destination. Because the trooper was still filling out the citation, she asked Shaw his address, weight, when he had arrived at the rest area, and if he had been drinking, as his eyes were bloodshot and red. During this time, Shaw was still making the trooper nervous.

[¶ 11] While the trooper continued writing Shaw a citation for driving under suspension, she again explained to him that she had requested a wrecker because he could not be permitted to drive, and she told Shaw that he needed to call for someone to come and pick him up. The trooper also asked Shaw if he had money to pay for the wrecker and told him that he would need to speak with the tow truck driver regarding the cost. Shaw then asked to sit in the Honda until the tow truck came, to which the trooper responded that he would have to stay with her so he "did not go anywhere." As the trooper finished writing the citation, she asked Shaw if the "paperwork" for the car was in the vehicle. Shaw responded, "It might be in there. Do you want me to go get it?" Shaw also stated that he "kinda wanted to smoke a cigarette." The trooper told Shaw that she needed to check for the insurance paperwork because she did not want to write him a ticket for having no insurance. At that point, Shaw stated, "It might be in the glove box."

[¶ 12] The trooper then left her patrol car and, upon opening the driver's side door of the Honda, immediately smelled raw marijuana and noticed, in plain view, marijuana leaves scattered around the gear shift. Upon opening the glove box, the trooper found proof that the vehicle was, in fact, insured but she did not find proof of registration. The trooper then continued looking for paperwork and found approximately two pounds of marijuana in the center console. Based on these circumstances, the trooper placed Shaw under arrest, and he was transported to Rawlins for processing. Later, marijuana was also found in Shaw's jacket when he was processed at the detention center. However, Trooper Schulmeister did not find this marijuana earlier during the pat down of Shaw, as she patted him down strict-

ly for weapons and was not thinking about drugs whatsoever.

[¶ 13] On December 26, 2006, Shaw was charged with one count of felony possession of marijuana, in violation of Wyo. Stat. Ann. § 35–7–1031(c)(iii) (LexisNexis 2007). On August 1, 2007, Shaw filed a motion to suppress the marijuana, arguing that his constitutional rights under the Fourth Amendment of the United States Constitution and under article 1, section 4 of the Wyoming Constitution were violated because Trooper Schulmeister had no legal right to enter the vehicle. The State filed an objection to Shaw's motion, arguing that Shaw's detention by the trooper was reasonable, that Shaw gave the trooper consent to enter the vehicle, that upon entering the vehicle, the trooper noted a strong odor of marijuana which justified the search of the vehicle, and that the marijuana inevitably would have been discovered pursuant to an inventory search. The trooper explained that Wyoming Highway Patrol policy requires that, whenever a vehicle is to be towed and impounded, the vehicle must be inventoried and troopers must complete a Vehicle Inventory Receipt. The trooper further testified that this policy protects the officers, the wrecking company, as well as the owner of the property.

[¶ 14] Shaw's motion to suppress was heard on August 23, 2007, and prior to taking testimony, the district court noted that it had reviewed the videotape of the contact between the trooper and Shaw. During the suppression hearing, Trooper Schulmeister testified as outlined above, and Trooper Brad McConell testified that he performed an inventory search of the vehicle pursuant to Wyoming Highway Patrol policy at the "state shop" in Elk Mountain, and that no additional contraband was found in the vehicle.

[¶ 15] Division of Criminal Investigation Special Agent Nicholas Biscelgia testified that on December 26, 2006, as a result of Trooper Schulmeister's request for assistance due to the large quantity of marijuana seized, he interviewed Trooper Schulmeister as well as Shaw. The agent further testified that, after Shaw waived his constitutional rights, he described for the agent the events leading up to his arrest, including that he told Trooper Schulmeister "she could go into the glove box of the vehicle" to obtain the insurance information, while hoping the trooper would not smell the marijuana because of its low quality. The agent also testified that Shaw made an unsolicited comment that Trooper Schulmeister "was really nice and [that she] had done a really good job." Shaw did not call any witnesses.

[¶ 16] In closing, the State argued that Trooper Schulmeister's actions throughout the encounter with Shaw were appropriate and reasonable: due to officer safety concerns; because Shaw had consented to the trooper's entry into the vehicle; because the smell of raw marijuana gave Trooper Schulmeister probable cause to search the vehicle; and that the mandatory inventory search would have made the discovery of the marijuana inevitable. Shaw argued that he should not have been issued a citation for driving with a suspended license because the trooper had not witnessed him driving the vehicle and, thus, the trooper had no authority to request proof of insurance. Shaw also argued that: He did not consent to Trooper Schulmeister's entry into the vehicle; that he should have been provided the opportunity to call someone to come and get him and to drive the vehicle for him; that there were no officer safety concerns; and that his continued detention after the trooper asked for his insurance was unlawful.

[¶ 17] In response to those arguments, the district court noted that the uncontroverted testimony from the DCI agent was that Shaw had admitted giving the trooper consent to enter the vehicle to obtain the insurance papers, that the trooper was trying to "cut Shaw some slack" by confirming the vehicle was insured so she did not have to write him another ticket, that the trooper had grounds to be nervous, that the trooper was doing exactly what she was expected to do when patrolling for stuck motorists, and that Trooper Schulmeister performed her duties courteously. The district court concluded that under the totality of the circumstances, the trooper's actions were entirely appropriate and not the kind of actions criticized in *O'Boyle v. State*, 2005 WY 83, 117 P.3d 401 (Wyo.2005). The court further not-

ed that it would review the videotape again and issue a written decision. Soon thereafter, on August 29, 2007, the district court issued a written opinion denying Shaw's motion. In its opinion, the district court found that Shaw had consented to the trooper's entry into the vehicle to look for proof of insurance when he stated the insurance paperwork "might be in the glove box." The district court went on to note that once the trooper had legally entered the vehicle and smelled marijuana, she had probable cause to search the vehicle for contraband.

[¶ 18]   On September 7, 2007, Shaw filed a notice of intent to change his plea to guilty, reserving the right to appeal the denial of his motion to suppress. On that same day, Shaw filed a motion to alter or amend the district court's denial of his motion to suppress, alleging "errors of fact and law." On October 26, Shaw changed his plea to guilty and was thereafter sentenced as noted above. A timely notice of appeal followed.

### DISCUSSION

#### Standard of Review

[¶ 19]   In this instance, the district court conducted a hearing and took evidence concerning the search and seizure at issue. In reviewing a trial court's ruling on a motion to suppress evidence, we do not interfere with the trial court's findings of fact unless the findings are clearly erroneous. We view the evidence in the light most favorable to the trial court's determination because the trial court has an opportunity at the evidentiary hearing to assess the credibility of the witnesses, weigh the evidence, and make the necessary inferences, deductions, and conclusions. The constitutionality of a particular search is a question of law that we review de novo. *Sam v. State*, 2008 WY 25, ¶ 9, 177 P.3d 1173, 1176 (Wyo.2008); *Fenton v. State*, 2007 WY 51, ¶ 5, 154 P.3d 974, 976 (Wyo. 2007) (quoting *Peña v. State*, 2004 WY 115, ¶ 25, 98 P.3d 857, 869 (Wyo.2004)).

#### Propriety of the Search and Seizure

[¶ 20]   Our precedents on this subject are voluminous. In *Speten v. State*, 2008 WY 63, ¶ 4, 185 P.3d 25, 27–28 (Wyo.2008) we de-scribed this analytical framework for evaluating issues such as those at hand:

> The issue of the constitutionality of a search often focuses upon the question of whether or not the officer had probable cause to search, or the question of whether the officer had reasonable suspicion to initiate an investigative detention. These questions are resolved by resort to an objective test, taking into account the totality of the circumstances, rather than by analyzing the subjective thought process of the officer. *Fertig v. State*, 2006 WY 148, ¶ 25, 146 P.3d 492, 500 (Wyo.2006) (probable cause); *Meadows v. State*, 2003 WY 37, ¶ 17, 65 P.3d 33, 37 (Wyo.2003) (investigative detention). Probable cause to search exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found[.]" *Damato v. State*, 2003 WY 13, ¶ 17, 64 P.3d 700, 707 (Wyo.2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 695–96, 116 S.Ct. 1657, 1661, 134 L.Ed.2d 911 (1996)). By contrast, reasonable suspicion is simply " 'a particularized and objective basis' for suspecting the particular person stopped of criminal activity." *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). Finally, while the test is objective, the officer's training, experience, and expertise are to be considered as part of the "totality of the circumstances." *McKenney v. State*, 2007 WY 129, ¶ 11, 165 P.3d 96, 98–99 (Wyo.2007); *Rohda v. State*, 2006 WY 120, ¶ 24, 142 P.3d 1155, 1167 (Wyo.2006); *Vassar v. State*, 2004 WY 125, ¶ 18 n. 7, 99 P.3d 987, 994 n. 7 (Wyo.2004).

Decisions such as those the district court made here are unfailingly fact intensive.

[¶ 21]   In *Flood v. State*, 2007 WY 167, ¶ 14, 169 P.3d 538, 543–44 (Wyo.2007) we described the three tiers of interaction between police and citizens:

> For Fourth Amendment purposes, we recognize three tiers of interaction between police and citizens. *Custer*, ¶ 13, 135 P.3d at 624–25. See also, *Collins v. State*, 854 P.2d 688, 691–92 (Wyo.1993). The least intrusive contact between a citizen and po-

lice is a consensual encounter. *Custer,* ¶ 13, 135 P.3d at 624–25. A consensual encounter is not a seizure and does not implicate Fourth Amendment protections. The second tier is the investigatory or Terry stop, named after the seminal case *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). An investigatory detention is a seizure under the Fourth Amendment. *Custer,* ¶ 13, 135 P.3d at 624–25. However, because of its limited nature, a law enforcement officer is only required to show "the presence of specific and articulable facts and rational inferences which give rise to a reasonable suspicion that a person has committed or may be committing a crime" in order to justify the detention. *Id.,* quoting *Wilson v. State,* 874 P.2d 215, 220 (Wyo.1994). The most intrusive encounter between police and a citizen is an arrest. An arrest " 'requires justification by probable cause to believe that a person has committed or is committing a crime.' " *Id.* at 625, 135 P.3d 620 quoting *Wilson,* 874 P.2d at 219–20. Also see *Wagner v. State,* 2008 WY 51, ¶¶ 10–14, 182 P.3d 506, 509–10 (Wyo.2008).

[¶ 22] Furthermore, in *Custer v. State,* 2006 WY 72, ¶ 17, 135 P.3d 620, 626 (Wyo. 2006) we elaborated:

As we recognized in *Rice v. State,* 2004 WY 130, ¶ 25, 100 P.3d 371, 379 (Wyo. 2004), a seizure does not occur simply when a police officer walks up to a person in a public place and asks a question, provided there is no showing of force or indication the person is restrained from leaving. See also, *Innis v. State,* 2003 WY 66, ¶ 17, 69 P.3d 413, 419 (Wyo.2003); *Perry v. State,* 927 P.2d 1158, 1163 (Wyo.1996). This principle is consistent with our ruling in *Gompf v. State,* 2005 WY 112, 120 P.3d 980, where we stated the Fourth Amendment was not implicated when officers approached a person's residence, knocked at the door, and asked questions.

[¶ 23] It is clear that the instant circumstances began as a consensual encounter between the state trooper and Shaw, and that it was not a "traffic stop" as that phrase is commonly used. Indeed, the trooper stopped to render aid to Shaw who was stuck in deep snow. It is evident from the record that Shaw was solicitous of that assistance, although he rejected the trooper's initial offer to pull him out of the snow. It is also evident from the context of the circumstances at the arrest, search and seizure scene that Shaw had been driving the car he was found in, and it was his intent to continue to drive it. The trooper asked to see Shaw's driver's license, which is wholly consistent with the trooper's duty as a police officer. Wyo. Stat. Ann. § 31–7–116 (Lexis-Nexis 2007) provides:

Every licensee shall have his driver's license in his immediate possession at all times when driving a motor vehicle and shall display the license upon demand of any judicial officer, municipal court judge, any officer or agent of the division or any police officer as defined in W.S. 31–5–102(a)(xxxiii). However, no person charged with violating this section shall be convicted if he produces in court a driver's license previously issued to him and valid at the time of his arrest. For the purposes of this section "display" means the surrender of his license to the demanding officer. After examination the officer shall immediately return the license to the licensee except as provided in W.S. 31–5–1205(k).

[¶ 24] The trooper's request to see Shaw's driver's license did not invoke any of the protections provided by the United States Constitution or the Wyoming Constitution. See *Rice v. State,* 2004 WY 130, ¶ 25, 100 P.3d 371, 379 (Wyo.2004). Once it was determined that Shaw had been driving, but had no driver's license, the initial consensual encounter (community caretaking activity) came to resemble a traffic stop or investigative detention. *Id.* at ¶ 7, 100 P.3d at 374. From the point in time when the trooper ascertained that Shaw had no driver's license, until she found the marijuana in Shaw's car, was a very brief period of time. Thus, we take note here that this case does not invoke our precedent set in *O'Boyle* (this holds true for other precedents akin to *O'Boyle* ).

[¶ 25] The trooper also wanted to see proof of insurance documentation. Wyo.

Stat. Ann. § 31–4–103(b) (LexisNexis 2007) (emphasis added) provides:

> (b) Any police officer as defined by W.S. 31–5–102(a)(xxxiii), issuing a citation for any *moving violation under W.S. 31–5–101 through 31–5–1402* or inspecting any vehicle, *shall require the operator of any motor vehicle required to be registered to produce evidence of whether the operator or owner of the motor vehicle has in full force and effect a motor vehicle liability policy in amounts provided by W.S. 31–9–405(b) or a bond in amounts provided by W.S. 31–9–102(a)(xi).* If the operator cannot show written proof of financial responsibility, the driver shall have seven (7) days to produce such proof. Any operator or owner of a motor vehicle required to be registered who is not able to demonstrate evidence of compliance with subsection (a) of this section may be charged with violating that subsection. Additionally, the judge may order any driver failing to produce written proof of financial responsibility to pay restitution in accordance with W.S. 7–9–101 through 7–9–115. Effective January 1, 1993, the displaying or exhibiting of a validly issued insurance identification card as provided by W.S. 31–8–201 by an operator or owner of the motor vehicle constitutes compliance with this section. No operator or owner of a motor vehicle charged with violating this section shall be convicted if he produces in court one (1) of the following which was valid at the time of arrest or at the time the citation was issued:
>
> > (i) A liability insurance policy previously issued to him;
> >
> > (ii) Evidence of a bond on file with the department in amounts provided by W.S. 31–9–102(a)(xi).

[¶ 26] Shaw argues that he was not stopped for a moving violation as contemplated by that statute and, therefore, he should not have been required to provide the insurance documentation or vehicle registration documentation demanded by the state trooper (although that was not at issue when Shaw gave his consent). Such violations as driving without a license, or with a suspended license, or without proof of insurance, are punishable under other chapters of the Motor Vehicles Code. Wyo. Stat. Ann. §§ 31–4–103 (and § 31–4–104) and 31–7–134 (and § 31–7–136) (LexisNexis 2007). Continuing, Shaw asserts that the trooper's decision to enter into the automobile in Shaw's possession was not authorized by § 31–4–103(b), and Shaw's consent to the trooper's search for it was based upon a false premise posed to him by the trooper.

[¶ 27] We read the statutes governing the use of motor vehicles in *pari materia* and to the extent that Shaw has focused his argument on "differences" between its various chapters, we are not persuaded that those "differences" undermine his conviction in any way. Moreover, we hasten to add that the trooper asked for Shaw's consent to look for proof of insurance, which is required by law, and Shaw tacitly consented, largely to avoid yet another potential citation. The district court issued a decision letter which recited the same factual scenario that we have outlined above. The district court concluded that Trooper Schulmeister had a legal right to enter the vehicle pursuant to Shaw's consent to search the glove box for proof of insurance, and once she entered the vehicle and smelled marijuana, she possessed the requisite probable cause to search the vehicle for contraband. Thus, the district court concluded that the marijuana seized by the trooper would be admissible at trial.

[¶ 28] We do not discern competent evidence in the record that Shaw's consent was not knowing and voluntary, even given that some misinformation may have been conveyed to him by the state trooper. Under the totality of these circumstances, we are persuaded that the district court's fact findings were not clearly erroneous or that the district court otherwise erred in denying the motion to suppress. As was the case in the district court, we deem Shaw's consent for the trooper to enter his car to be dispositive and decline to address the matter of inevitable discovery of the contraband during the inventory process.

## CONCLUSION

[¶ 29] The district court did not err in denying Shaw's motion to suppress and the

judgment and sentence of the district court are affirmed.